UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
CO.,

       Plaintiffs,

vs.

MILLER CHIROPRACTIC AND MEDICAL
CENTERS, INC., d/b/a PREMIER MILLER AUTO
INJURY TREATMENT CENTERS, CHRISTOPHER
SHANE MILLER, MURTHY S. RAVIPATI, M.D.,
BAYVIEW MEDICAL & REHAB CENTER, INC.,
ELIZABETH SALVIA, JONATHAN ASCENSAO,
NATHALIE ASCENSAO, L.M.T., LILIBET
SANCHEZ, JAMES A. ZACCARI, D.O., FAMILY
HEALTH MEDICAL CENTER, INC, and JOSE V.
PUJOLS, JR.,

       Defendants.

_____/

**Jury Trial Demand**

## COMPLAINT

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue the Defendants and allege as follows:

1.     This action seeks to recover more than $2,300,000.00 that the respective Defendants wrongfully obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance

charges through Defendants Miller Chiropractic and Medical Centers, Inc. d/b/a Premier Miller Auto Injury Treatment Centers ("Premier"), Bayview Medical & Rehab Center Inc. ("Bayview"), and Family Health Medical Center, Inc ("Family Medical"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including purported examinations, physical therapy services, chiropractic services, extracorporeal shockwave therapy ("ESWT"), home medical equipment ("HME"), and related services and goods (collectively the "Fraudulent Services") that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent, and unlawful no-fault PIP claims that the Defendants have submitted through Premier, Bayview, and Family Health because of the fraudulent and unlawful activities described herein.

3.      As set forth herein, the Defendants never were entitled to receive payment on the PIP insurance claims that they submitted to Plaintiffs, because:

(i)      at all relevant times, the Defendants operated in pervasive violation of Florida law, including the Florida Health Care Clinic Act, Fla. Stat. §§ 400.990 et seq. (the "Clinic Act"), Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. §817.234(7) (the "False and Fraudulent Insurance Claims Statute"), and Florida's Physical Therapy Practice Act, Fla. Stat. §§ 486.011-486.172 (the "Physical Therapy Act"), thereby rendering their PIP insurance charges noncompensable and unenforceable;

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to

2

pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them;

(iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently and unlawfully inflate the charges submitted to GEICO;

(iv)    in many cases, Premier, Bayview, and Family Health unlawfully billed GEICO for "physical therapy" services performed by massage therapists and unlicensed individuals;

(v)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses to perform the services;

(vi)    in many cases, the billing submitted through Premier, Bayview, and Family Health misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and was submitted in violation of the billing requirements set forth in the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§627.730-627.7405 (the "No-Fault Law"); and

(vii)    in many cases, the Fraudulent Services never were legitimately provided in the first instance.

4.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed through Premier, Bayview, and Family Health to GEICO.

5.    The Defendants at all relevant times have known that they were not entitled to receive payment on the PIP insurance claims that they submitted to Plaintiffs because of the fraudulent and unlawful activities described herein.

6.    The charts annexed hereto as Exhibits "1" – "3" set forth large, representative samples of the fraudulent and unlawful claims that have been identified

to date that the respective Defendants have submitted through Premier, Bayview, and Family Health to GEICO.

7.     The Defendants' interrelated fraudulent and unlawful schemes began no later than 2020, and have continued uninterrupted since that time. As a result of the Defendants' fraudulent and unlawful schemes, Plaintiffs have incurred damages of more than $2,300,000.00.

## I.     Plaintiffs

8.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "GEICO") are Nebraska corporations with their principal places of business in Bethesda, Maryland. GEICO is authorized to conduct business and issue automobile insurance policies in Florida.

## II.    Defendants

9.     Defendant Premier is a Florida corporation with its principal place of business in Tampa, Florida. Premier was incorporated in Florida on or about February 4, 2003, was owned and controlled at all relevant times by Christopher Miller ("Miller"), and was used as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers.

10.    Premier operates what falsely purport to be two properly-licensed health care clinics, located at: (i) 9325 Bay Plaza Boulevard, Suite 209, Tampa, FL 33619 ("Premier Bay Plaza"), and (ii) 720 E. Fletcher Avenue Suite 100 A/B, Tampa, FL 33612 ("Premier E. Fletcher").

4

11. Defendant Miller resides in and is a citizen of Florida. At all relevant times, Miller owned and controlled Premier, and used Premier as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers.

12. Defendant Bayview is a Florida corporation with its principal place of business in Lakeland, Florida. Bayview was incorporated in Florida on or about January 29, 2004, was owned and controlled at all relevant times by Elizabeth Salvia ("Salvia"), Jonathan Ascensao ("J. Ascensao"), Nathalie Ascensao, L.M.T. ("N. Ascensao"), and Lilibet Sanchez ("Sanchez"), and was used as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers.

13. Bayview operates what falsely purport to be two properly-licensed health care clinics, located at: (i) 100 West Main Street, Lakeland, FL 33815 ("Bayview West Main"), and (ii) 10845 Park Drive, Riverview, FL 33569 ("Bayview Park").

14. Defendant Salvia resides in and is a citizen of Florida. At all relevant times, Salvia owned and controlled Bayview, and used Bayview as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers.

15. Defendant J. Ascensao resides in and is a citizen of Florida. At all relevant times, J. Ascensao owned and controlled Bayview, and used Bayview as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers.

16. Defendant N. Ascensao resides in and is a citizen of Florida. At all relevant times, N. Ascensao owned and controlled Bayview, and used Bayview as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers.

17. Defendant Sanchez resides in and is a citizen of Florida. At all relevant

5

times, Sanchez owned and controlled Bayview, and used Bayview as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers.

18. Defendant Family Health is a Florida corporation with its principal place of business in Tampa, Florida. Family Health was incorporated in Florida on or about April 19, 2019, was owned and controlled by Jose V. Pujols, Jr. ("Pujols"), and was used as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers.

19. Defendant Pujols resides in and is a citizen of Florida. Pujols owned and controlled Family Health, and used Family Health as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers.

20. Defendant Murthy Ravipati, M.D. ("Ravipati") resides in and is a citizen of Florida. Ravipati was licensed to practice medicine in Florida on or about November 8, 1988. Ravipati falsely purported to serve as the medical director at: (i) Premier Bay Plaza between November 2013 and the present; (ii) Premier E. Fletcher between November 2013 and the present; (iii) Bayview West Main between March 2024 and the present; (iv) Bayview Park between March 2024 and the present; and (v) Family Health between June 2019 and the present, and purported to perform or directly supervise many of the Fraudulent Services that were billed through Premier and Family Health to GEICO.

21. Ravipati has a criminal record and history of professional discipline by the Florida Board of Medicine. In particular, in April 1994, Ravipati's medical license was suspended for five years, and Ravipati was fined, after Ravipati pled guilty to five

6

counts of battery in the Fifth Judicial Circuit Court of the State of Florida after five of Ravipati's patients complained that Ravipati had inappropriately touched them while he was performing medical examinations.

22.    Upon information and belief, Ravipati's criminal and professional disciplinary history – which can be located by prospective employers, referral sources, and patients through a simple internet search – has made it practically impossible for him to obtain legitimate employment as a physician, and contributed to his decision and motive to participate in the fraudulent scheme described herein.

23.    Defendant James Anthony Zaccari, D.O. ("Zaccari") resides in and is a citizen of Florida. Zaccari was licensed to practice medicine in Florida on or about July 10, 1990. Zaccari purported to serve as the medical director at: (i) Bayview West Main between May 2015 and March 2024, and (ii) Bayview Park between May 2015 and March 2024, and purported to perform Fraudulent Services that were billed through Bayview to GEICO.

24.    Zaccari has a history of professional discipline by the Florida Board of Osteopathic Medicine. In particular, in March 2007, Zaccari was reprimanded and fined, after he was charged with prescribing narcotics and other habit-forming drugs to patients via the internet, without completing proper medical examinations or obtaining appropriate patient histories.

25.    Upon information and belief, Zaccari's history of professional discipline – which can be located by prospective employers, referral sources, and patients through a simple internet search – has made it practically impossible for him to obtain

7

legitimate employment as a physician, and contributed to his decision and motive to participate in the fraudulent scheme described herein.

### III. Other Relevant Individuals

26. Although not presently named as Defendants in this action, James Todd Seidler-Brennan, D.C. ("Seidler-Brennan"), Jesse Michael Coleman, D.C. ("Coleman"), Joseph Ciccarello, D.C. ("Ciccarello"), Frank James Badala, D.C. ("Badala"), George B. Bley II, D.C. ("Bley"), Elizabeth Anne Douglas, D.C. ("Douglas"), Dipti Ramesh Patel, D.C. ("Patel"), Elizabeth Echevarria, D.C. ("Echevarria"), Mari Ann Buchanan D.C. ("Buchanan"), and Yvette Rosa, D.C. ("Rosa") are relevant to understanding Plaintiffs' claims in this action.

27. Seidler-Brennan was licensed to practice chiropractic in Florida on September 23, 2013, was employed by or associated with Premier, and purported to perform Fraudulent Services on behalf of Premier, at the direction of Premier, Miller, and Ravipati.

28. Coleman was licensed to practice chiropractic in Florida on February 12, 2015, was employed by or associated with Premier, and purported to perform Fraudulent Services on behalf of Premier, at the direction of Premier, Miller, and Ravipati.

29. Ciccarello was licensed to practice chiropractic in Florida on April 8, 1973, was employed by or associated with Premier, and purported to perform Fraudulent Services on behalf of Premier, at the direction of Premier, Miller, and Ravipati.

30. Badala was licensed to practice chiropractic in Florida on December 2, 2008, was employed or associated with Premier, and purported to perform Fraudulent Services on behalf of Premier, at the direction of Premier, Miller, and Ravipati.

31. Bley was licensed to practice chiropractic in Florida on July 26, 1995, was employed by or associated with Premier, and purported to perform Fraudulent Services on behalf of Premier, at the direction of Premier, Miller, and Ravipati.

32. Douglas was licensed to practice chiropractic in Florida on March 26, 2014, was employed by or associated with Bayview, and purported to perform Fraudulent Services on behalf of Bayview, at the direction of Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Ravipati, and Zaccari.

33. Patel was licensed to practice chiropractic in Florida on May 15, 2017, was employed by or associated with Bayview, and purported to perform Fraudulent Services on behalf of Bayview, at the direction of Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Ravipati, and Zaccari.

34. Echevarria was licensed to practice chiropractic in Florida on December 16, 2013, was employed by or associated with Family Health, and purported to perform Fraudulent Services on behalf of Family Health, at the direction of Family Health, Pujols, and Ravipati.

35. Buchanan was licensed to practice chiropractic in Florida on January 7, 2002, was employed by or associated with Family Health, and purported to perform Fraudulent Services on behalf of Family Health, at the direction of Family Health, Pujols, and Ravipati.

9

36.     Rosa was licensed to practice chiropractic in Florida on August 19, 1999, was employed by or associated with Family Health, and purported to perform Fraudulent Services on behalf of Family Health, at the direction of Family Health, Pujols, and Ravipati.

## JURISDICTION AND VENUE

37.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and the action is between citizens of different states.

38.     The Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations("RICO") Act).

39.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

40.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.     Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

41.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system

10

is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to insureds.

42.     Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

43.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided.

44.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

45.     Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

46.     Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such

11

services, including a mobile clinic and a portable equipment provider."

47.    Pursuant to the Clinic Act, every clinic operating in Florida must – among other things – be licensed by the Florida Agency for Health Care Administration ("AHCA"), and appoint a physician as medical director or clinic director, who must agree in writing to accept legal responsibility for certain enumerated activities on behalf of the clinic.

48.    Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action."

49.    In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

50.    Moreover, a clinic medical director must "review any patient referral contracts or agreements executed by the clinic."

51.    What is more, pursuant to the Clinic Act, a clinic medical director must "[s]erve as the clinic records owner as defined in [Fla. Stat. §] 456.057." Pursuant to Fla. Stat. § 456.057(10), "[a]ll records owners shall develop and implement policies, standards, and procedures to protect the confidentiality and security of the medical record," and all "[e]mployees of records owners shall be trained in these policies,

standards, and procedures."

52.     Furthermore, pursuant to the Clinic Act, no Florida health care clinic may operate without the legitimate, day-to-day supervision of a physician-medical director.

53.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

54.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

55.     Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from patients with PIP insurance.

56.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

57.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. At the same time, a health care services provider, including a clinic licensed under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

58.     Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a)     in accordance with generally accepted standards of medical practice;

(b)     clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c)     not primarily for the convenience of the patient, physician, or other health care provider.

59.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy and for services performed by massage therapists.

60.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for any services provided by massage therapists.

61.     Pursuant to the Physical Therapy Act: (i) massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy; and (ii) unlicensed and unsupervised individuals may not practice physical therapy or hold themselves out as being able to practice physical therapy.

14

62.     Pursuant to the Physical Therapy Act and the No-Fault Law, insurers such as GEICO are not required to pay for any services performed by massage therapists or for physical therapy services that are unlawfully performed by unlicensed and unsupervised individuals.

63.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)     for any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(ii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)   with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

64.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes.

65.     The instructions promulgated by CMS for the completion of HCFA-1500 forms require – among other things – that all HCFA-1500 forms set forth, in Box 31, the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

15

66. To "directly supervise" a service, a supervising health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

67. Additionally, pursuant to the No-Fault Law, in order for a health care service to be eligible for PIP reimbursement, the applicable HCFA-1500 claim form must set forth the professional license number of the practitioner who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials."

68. Insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual licensed health care practitioners who performed or directly supervised the underlying services.

## II.   The Defendants' Interrelated Fraudulent and Unlawful Schemes

69. Since at least 2020, and continuing through the present day, the Defendants conceived and implemented interrelated fraudulent and unlawful schemes in which they billed GEICO and other Florida automobile insurers millions of dollars for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

## A.   The Unlawful Billing for Services Performed by Massage Therapists and Unlicensed/Unsupervised Individuals at Premier, Bayview, and Family

**Health, and Misrepresentations Regarding the Identities of the Actual Treating Practitioners**

70. As part of their fraudulent and unlawful schemes, the Defendants billed GEICO for purported "physical therapy" services provided to GEICO Insureds at Premier, Bayview, and Family Health.

71. As set forth in Exhibits "1" – "3", the purported "physical therapy" services constituted the substantial majority of the services that the Defendants billed through Premier, Bayview, and Family Health to GEICO.

72. In the claims for "physical therapy" services identified in Exhibits "1" – "3", the purported "physical therapy" services constituted the substantial majority of services that the Defendants billed through Premier, Bayview, and Family Health to GEICO.

73. In the claims for "physical therapy" services identified in Exhibits "1" – "3", the services were unlawfully performed – to the extent that they were performed at all – by unlicensed and unsupervised individuals, and by massage therapists, including individuals named Angelique Lopez Mingo, L.M.T. ("Lopez"), Jessica Hathon, L.M.T. ("Hathon"), David Alexander, L.M.T. ("Alexander"), N. Ascensao, Odin Chacon, L.M.T. ("Chacon"), Rafael Frias, L.M.T. ("Frias"), and Lillian Borjas, L.M.T. ("Borjas").

74. Lopez was employed by or associated with Premier, and purported to perform many of the Fraudulent Services on behalf of Premier.

75. Hathon was employed by or associated with Premier, and purported to

17

perform many of the Fraudulent Services on behalf of Premier.

76.    Alexander was employed by or associated with Premier, and purported to perform many of the Fraudulent Services on behalf of Premier.

77.    N. Ascensao was employed by or associated with Bayview, and purported to perform many of the Fraudulent Services on behalf of Bayview.

78.    Chacon was employed or associated with Bayview, and purported to perform many of the Fraudulent Services on behalf of Bayview.

79.    Frias was employed by or associated with Family Health, and purported to perform many of the Fraudulent Services on behalf of Family Health.

80.    Borjas was employed by or associated with Family Health, and purported to perform many of the Fraudulent Services on behalf of Family Health.

81.    The Defendants were aware of the fact that they could not lawfully recover PIP Benefits for services performed by massage therapists or unsupervised/unlicensed individuals.

82.    As a result, and in order to conceal the fact that Lopez, Hathon, Alexander, N. Ascensao, Chacon, Frias, Borjas, and other massage therapists and unsupervised/unlicensed individuals performed the purported physical therapy services that were unlawfully billed through Premier, Bayview, and Family Health to GEICO, the Defendants deliberately omitted any reference to Lopez, Hathon, Alexander, N. Ascensao, Chacon, Frias, Borjas, and other massage therapists and unlicensed/unsupervised individuals associated with Premier, Bayview, and Family Health on the HCFA-1500 forms that they used to bill for the putative physical therapy

services.

83.     What is more, in the claims for physical therapy services identified in Exhibits "1" and "3", Premier, Miller, Ravipati, Family Health, and Pujols routinely and falsely listed Ravipati in Box 31 of the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

84.     In fact, Ravipati – who was simultaneously purporting to work at numerous health care practices at numerous locations – did not legitimately perform or directly supervise the physical therapy services in the claims identified in Exhibits "1" and "3", and could not have legitimately performed or directly supervised the physical therapy services.

85.     For example:

(i)     On January 30, 2020, Premier, Miller, and Ravipati purported to provide at least 21 individual physical therapy services to at least three individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least one 45-minute initial examination and three 15-minute follow-up examinations that were performed on four GEICO Insureds at Premier and another practice called Complete Chiropractic Health Care ("Complete Chiro"); and (b) at least 58 additional physical therapy services purportedly provided to at least eight additional GEICO Insureds at Premier and Complete Chiro, including at least 14.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21.25 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on January 30, 2020.

(ii)    On March 2, 2020, Premier, Miller, and Ravipati purported to provide at least 38 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise, least 54 additional physical therapy services purportedly provided to at least eight additional GEICO Insureds at Family Health and another practice called Gulf Bay Care ("Gulf Bay"), including at least 14.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on March 2, 2020.

(iii)    On March 19, 2020, Premier, Miller, and Ravipati purported to provide at least 82 individual physical therapy services to at least 13 individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 20.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least eight 15-minute follow-up examinations that were performed on eight GEICO Insureds at Premier; and (b) at least 27 additional physical therapy services purportedly provided to at least four additional GEICO Insureds at Family Health and Gulf Bay, including at least 6.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 29.25 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on March 19, 2020.

(iv)    On May 28, 2020, Premier, Miller, and Ravipati purported to provide at least 82 individual physical therapy services to at least 11 individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 20.5 hours of physical therapy services that required direct, one-to-

one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least two 15-minute follow-up examinations that were performed on two GEICO Insureds at Premier; and (b) at least 14 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Family Health, including at least three hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 23.5 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on May 28, 2020.

(v)     On November 5, 2020, Family Health, Pujols, and Ravipati purported to provide at least nine individual physical therapy services to at least two individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least two 45-minute initial examinations, four 15-minute follow-up examinations, and one 20-minute follow-up examination that were performed on seven GEICO Insureds at Family Health, Complete Chiro, and Premier; and (b) at least 81 additional physical therapy services purportedly provided to at least 15 additional GEICO Insureds at Premier, including at least 20.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 25 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on November 5, 2020.

(vi)    On December 28, 2020, Family Health, Pujols, and Ravipati purported to provide at least 49 individual physical therapy services to at least seven individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 12.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least one five-

minute follow-up examination and five 20-minute follow-up examinations that were performed on six GEICO Insureds at Premier; and (b) at least 36 additional physical therapy services purportedly provided to at least eight additional GEICO Insureds at Premier, including at least nine hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 23 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on December 28, 2020.

(vii) On May 10, 2021, Family Health, Pujols, and Ravipati purported to provide at least 18 individual physical therapy services to at least three individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least one 30-minute initial examination, one 5-minute follow-up examination, and one 20-minute follow-up examination that were performed on three GEICO Insureds at Premier and Preferred Care; and (b) at least 57 additional physical therapy services purportedly provided to at least 10 additional GEICO Insureds at Premier, including at least 14.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 19.5 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on May 10, 2021.

(viii) On June 24, 2021, Premier, Miller, and Ravipati purported to provide at least 58 individual physical therapy services to at least eight individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least one 45-minute initial examination that was performed on one GEICO Insured at Family Health; and (b) at least 42 additional physical therapy services purportedly provided to at least six additional GEICO Insureds at Family

22

Health, including at least 14.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 29.5 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on June 24, 2021.

(ix)     On August 16, 2021, Premier, Miller, and Ravipati purported to provide at least 45 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least two 30-minute initial examinations and four 20-minute follow-up examinations that were performed on six GEICO Insured at Premier; and (b) at least 31 additional physical therapy services purportedly provided to at least four additional GEICO Insureds at Gulf Bay and Family Health, including at least 7.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on August 16, 2021.

(x)     On August 26, 2021, Premier, Miller, and Ravipati purported to provide at least 56 individual physical therapy services to at least 10 individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least four 20-minute initial examinations that were performed on four GEICO Insured at Premier and Family Health; and (b) at least 17 additional physical therapy services purportedly provided to at least 4 additional GEICO Insureds at another practice called Guardian Angel Health Services ("Guardian Angel Health") and Family Health, including at least 4.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the

services. In all, GEICO received billing for at least 19.5 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on August 26, 2021.

(xi)  On October 7, 2021, Family Health, Pujols, and Ravipati purported to provide at least 12 individual physical therapy services to at least three individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least three hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least two five-follow-up examinations and three 20-minute follow-up examinations that were performed on five GEICO Insured at Premier and Guardian Angel Health; and (b) at least 62 additional physical therapy services purportedly provided to at least nine additional GEICO Insureds at Premier and Guardian Angel Health, including at least 15.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 19.25 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on October 7, 2021.

(xii)  On December 9, 2021, Family Health, Pujols, and Ravipati purported to provide at least 16 individual physical therapy services to at least four individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least four hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least two 45-minute initial examinations, one five-minute follow-up examination, five 20-minute follow-up examinations, and one 40-minute follow-up examination that were performed on nine GEICO Insureds at Family Health and Premier; and (b) at least 59 additional physical therapy services purportedly provided to at least ten additional GEICO Insureds at Complete Chiro and Premier, including at least 14.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 22.5 hours of services that Ravipati

purported to personally perform, or at least directly supervise, at multiple different locations on December 9, 2021.

(xiii)  On January 6, 2022, Family Health, Pujols, and Ravipati purported to provide at least 34 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 8.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least six 20-minute follow-up examinations that were performed on six GEICO Insureds at Premier; and (b) at least 31 additional physical therapy services purportedly provided to at least eight additional GEICO Insureds at Premier, including at least 7.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 18.25 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on January 6, 2022.

(xiv)  On March 7, 2022, Premier, Miller, and Ravipati purported to provide at least 71 individual physical therapy services to at least nine individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 17.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least one five-minute follow-up examination and two 10-minute follow-up examinations that were performed on three GEICO Insureds at Premier and Guardian Angel Health; and (b) at least 6 additional physical therapy services purportedly provided to at least one additional GEICO Insured at Guardian Angel Health, including at least 1.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insured throughout the services. In all, GEICO received billing for at least 19.5 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on March 7, 2022.

(xv)   On March 28, 2022, Premier , Miller, and Ravipati purported to provide at least 60 individual physical therapy services to at least ten individual Insureds, and falsely contended in the resulting bills to GEICO that Ravipati personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 15 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Ravipati also purported to personally perform, or at least directly supervise: (a) at least one 30-minute initial examination and three 20-minute follow-up examinations that were performed on two GEICO Insureds at Premier; and (b) at least 4 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Guardian Angel Health and Optimal Performance, including at least one hour of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 17.5 hours of services that Ravipati purported to personally perform, or at least directly supervise, at multiple different locations on March 28, 2022.

86.   These are only representative examples. In the claims for physical therapy services that are identified in Exhibits "1" and "3", Premier, Miller, Ravipati, Family Health, and Pujols routinely falsely represented that Ravipati had performed – or at least directly supervised – an impossible number of physical therapy services on individual dates, considering the amount of services he simultaneously was purporting to perform or directly supervise at other health care clinics at multiple locations on those same dates.

87.   It is impossible that Ravipati routinely performed or directly supervised such a high volume of services, typically at multiple locations, on individual dates.

88.   Furthermore, upon information and belief, the fraudulent billing for physical therapy services that Premier, Miller, Ravipati, Family Health, and Pujols submitted to GEICO constituted only a fraction of the total fraudulent billing for

physical therapy services that they submitted to all of the automobile insurers in the Florida automobile insurance market.

89.     GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

90.     It is extremely improbable, to the point of impossibility, that Premier, Miller, Ravipati, Family Health, and Pujols only submitted fraudulent billing to GEICO and that they did not simultaneously bill other automobile insurers.

91.     Thus, upon information and belief, the impossible number of physical therapy services that Ravipati purported to directly supervise or provide to GEICO Insureds at Premier and Family Health – and other clinics on individual dates of service, including but not limited to the dates of service identified above – constituted only a fraction of the total number of physical therapy services that Ravipati purported to perform or directly supervise on those same dates of service.

92.     In further keeping with the fact that Ravipati did not legitimately perform or directly supervise the physical therapy services in the claims identified in Exhibit "1", GEICO routinely received billing from Ravipati, Premier, and Miller five times a week, despite the fact that Premier E. Fletcher and Premier Bay Plaza's January 2020, March 2024, and April 2024 AHCA licensing applications represented that Ravipati was only present at Premier E. Fletcher once a week.

93.     Likewise, despite the fact that Family Health's November 2021 clinic licensing application represented that Ravipati was only present at Family Health eight

27

hours per month, GEICO routinely received billing from Ravipati, Premier, and Miller at least twice a week.

94.     Moreover, in the claims for physical therapy services identified in Exhibit "2", Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati routinely and falsely listed Douglas in Box 31 of the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

95.     In fact, Douglas did not legitimately perform or directly supervise the physical therapy services in the claims identified in Exhibit "2".

96.     In keeping with the fact that Douglas did not legitimately perform or directly supervise the physical therapy services in the claims identified in Exhibit "2", the physical therapy services that Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati purportedly provided to Insureds were not tailored to each patient's individual circumstances and presentation, and therefore were not provided in accordance with legitimate standards of care.

97.     Rather, in the claims identified in Exhibit "2", the Insureds were routinely provided with the same handful of physical therapy "treatments" – purportedly performed or directly supervised by Douglas – without regard for the Insureds' individual circumstances.

98.     The Insureds in the claims identified in Exhibit "2" were provided the same handful of physical therapy "treatments" because Douglas did not legitimately perform or directly supervise the underlying services.

99.     Had Douglas legitimately performed or directly supervised the physical

therapy "treatments", she would have noted that the individual physical therapy services were not tailored to each patient's individual circumstances and presentation, and would have taken immediate corrective action.

100. In the claims for "physical therapy" services identified in Exhibits "1" – "3", the Defendants routinely falsely misrepresented that the physical therapy services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i) the purported physical therapy services were performed – to the extent that they were performed at all – by massage therapists and unlicensed/unsupervised individuals, in contravention of Florida law;

(ii) Premier, Bayview, and Family Health could not lawfully recover PIP Benefits for the purported physical therapy services, because the services were performed by massage therapists and unlicensed/unsupervised individuals, and because the clinics operated in violation of Florida law; and

(iii) the Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who actually performed or directly supervised the putative physical therapy services.

101. In this context, Zaccari and Ravipati – who, at all relevant times, purported to be the medical directors at Premier, Bayview, and Family Health, respectively – did not, and could not have, legitimately served as medical directors at the Premier, Bayview, and Family Health clinics.

102. Had Zaccari and Ravipati legitimately served as the medical directors at the Premier, Bayview, and Family Health clinics, they would have noted – among other things – that the physical therapy services provided at Premier, Bayview, and Family Health were unlawfully performed by massage therapists and

unlicensed/unsupervised individuals, and unlawfully billed to GEICO, and would have taken immediate corrective action.

**B.    The Defendants' Fraudulent Treatment and Billing Protocols**

103.    In the claims identified in Exhibits "1" – "3", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor accidents they experienced.

104.    Even so, in the claims identified in Exhibits "1" – "3", the Defendants purported to subject almost every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to this "treatment".

105.    The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" – "3" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the absence of any actual continuing medical problems arising from any actual automobile accidents.

106.    Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

107. No legitimate physician, health care practitioner, or clinic would permit the fraudulent treatment and billing protocols described below to proceed under their auspices.

108. The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because they sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1.    The Fraudulent Charges for Initial Examinations at Premier, Bayview, and Family Health**

109. As an initial step in their fraudulent treatment and billing protocols, the Defendants purported to provide many of the Insureds in the claims identified in Exhibits "1" – "3" with an initial examination.

110. The purported initial examinations then were billed to GEICO in the following manner:

(i)     in the claims identified in Exhibit "1", Premier, Miller, and Ravipati billed GEICO under CPT code 99203 for each initial examination that they purported to provide;

(ii)    in the claims identified in Exhibit "2", Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati billed GEICO under CPT code 99204 for each initial examination that they purported to provide; and

(iii)   in the claims identified in Exhibit "3", Family Health, Pujols, and Ravipati billed GEICO under CPT codes 99203 and 99204 for each initial examination that they purported to provide.

111. In the claims for initial examinations identified in Exhibits "1" – "3", the Defendants falsely represented that they were entitled to recover PIP Benefits in the

first instance, when in fact they were not because they operated in violation of Florida law.

112.   In the claims for initial examinations identified in Exhibits "1" – "3", the Defendants also misrepresented the nature, extent, and results of the initial examinations, and whether they had been legitimately performed in the first place.

**(i)   Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

113.   Pursuant to the American Medical Association's CPT Assistant, which governs the use of CPT codes used in PIP insurance billing, the use of CPT code 99203 to bill for an initial examination typically represents that the patient presented with problems of moderate severity.

114.   The CPT Assistant provides various clinical examples of moderate severity presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination, including:

(i)   Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)   Initial office evaluation of a 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuriain new patient, without cystoscopy. (Internal Medicine)

(iv)   Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)   Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

115.    Accordingly, pursuant to the CPT Assistant, the moderate severity presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

116.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination typically represents that the patient presented with problems of moderate to high severity.

117.    The CPT Assistant provides the following clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination, including:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

118.   Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

119.   However, to the extent that the Insureds in the claims identified in Exhibits "1" – "3" had any presenting problems at all as the result of their typically-minor automobile accidents, the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

120.   For instance, in many of the claims identified in Exhibits "1" – "3", the Insureds did not seek treatment at any hospital as the result of their accident, and to the limited extent that the Insureds in the claims identified in Exhibits "1" – "3" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis and then discharged with nothing more serious than a minor soft tissue diagnosis.

121.   Furthermore, in most of the claims identified in Exhibits "1" – "3", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accident, and that no one was seriously injured in their accidents, or injured at all.

122.   Even so, in the claims for initial examinations identified in Exhibits "1" – "3", the Defendants billed for the putative initial examinations using CPT codes

99203 and 99204, and thereby falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity, respectively.

123. For example:

(i) On March 5, 2020, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JG by Ravipati on March 6, 2020, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii) On April 16, 2020, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that RM's vehicle was drivable following the accident. The police report further indicated that RM was not injured and did not complain of any pain at the scene. In keeping with the fact that RM was not injured, RM did not visit any hospital emergency room following the accident. To the extent that RM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of RM by Ravipati on April 23, 2020, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iii) On April 23, 2020, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AM by

35

Ravipati on April 27, 2020, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)    On May 18, 2020, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not injured, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CM by Ravipati on May 19, 2020, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(v)    On June 10, 2020, an Insured named IY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that IY's vehicle was drivable following the accident. The police report further indicated that IY was not injured and did not complain of any pain at the scene. In keeping with the fact that IY was not injured, IY did not visit any hospital emergency room following the accident. To the extent that IY experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of IY by Douglas on June 12, 2020, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)    On June 26, 2020, an Insured named HS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that HS's vehicle was drivable following the accident. The police report further indicated that HS was not injured and did not complain of any pain at the scene. In keeping with the fact that HS was not injured, HS did not visit any hospital emergency room following the accident. To the extent that HS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of HS by Douglas on June 30, 2020, Bayview, Salvia, J. Ascensao, N. Ascensao,

Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)    On June 29, 2020, an Insured named BO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that BO's vehicle was drivable following the accident. The police report further indicated that BO was not injured and did not complain of any pain at the scene. In keeping with the fact that BO was not injured, BO did not visit any hospital emergency room following the accident. To the extent that BO experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of BO by Douglas on July 7, 2020, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)    On November 18, 2020, an Insured named ST was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that ST's vehicle was drivable following the accident. The police report further indicated that ST was not injured and did not complain of any pain at the scene. In keeping with the fact that ST was not injured, ST did not visit any hospital emergency room following the accident. To the extent that ST experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of ST by Douglas on November 23, 2020, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)    On January 18, 2021, an Insured named IR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that IR's vehicle was drivable following the accident. The police report further indicated that IR was not injured and did not complain of any pain at the scene. In keeping with the fact that IR was not injured, IR did not visit any hospital emergency room following the accident. To the extent that IR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of IR by Douglas on January 19, 2021, Bayview, Salvia, J.

37

Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x) On March 7, 2021, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AC's vehicle was drivable following the accident. The police report further indicated that AC was not injured and did not complain of any pain at the scene. In keeping with the fact that AC was not injured, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AC by Buchanan on March 19, 2021, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xi) On March 14, 2021, an Insured named EA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that EA's vehicle was drivable following the accident. The police report further indicated that EA was not injured and did not complain of any pain at the scene. In keeping with the fact that EA was not injured, EA did not visit any hospital emergency room following the accident. To the extent that EA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of EA by Ravipati on March 25, 2021, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xii) On December 12, 2021, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AS by Ravipati on December 20, 2021, Premier, Miller,

and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiii)   On March 14, 2022, an Insured named MF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MF's vehicle was drivable following the accident. The police report further indicated that MF was not injured and did not complain of any pain at the scene. In keeping with the fact that MF was not injured, MF did not visit any hospital emergency room following the accident. To the extent that MF experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MF by Ravipati on March 15, 2022, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiv)   On April 3, 2022, an Insured named MW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MW's vehicle was drivable following the accident. The police report further indicated that MW was not injured and did not complain of any pain at the scene. In keeping with the fact that MW was not injured, MW did not visit any hospital emergency room following the accident. To the extent that MW experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MW by Douglas on April 14, 2022, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv)   On April 12, 2022, an Insured named IA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that IA's vehicle was drivable following the accident. The police report further indicated that IA was not injured and did not complain of any pain at the scene. In keeping with the fact that IA was not injured, IA did not visit any hospital emergency room following the accident. To the extent that IA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of IA by Douglas on April 14, 2022, Bayview, Salvia, J. Ascensao, N. Ascensao,

Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvi) On April 23, 2022, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured and did not complain of any pain at the scene. In keeping with the fact that MM was not injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MM by Ravipati on May 2, 2022, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xvii) On May 10, 2022, an Insured named MV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MV's vehicle was drivable following the accident. The police report further indicated that MV was not injured and did not complain of any pain at the scene. In keeping with the fact that MV was not injured, MV did not visit any hospital emergency room following the accident. To the extent that MV experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MV by Douglas on May 11, 2022, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xviii) On June 28, 2022, an Insured named KM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that KM's vehicle was drivable following the accident. The police report further indicated that KM was not injured and did not complain of any pain at the scene. In keeping with the fact that KM was not injured, KM did not visit any hospital emergency room following the accident. To the extent that KM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of KM by Ravipati on July 8, 2022, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99204, and thereby

falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xix) On January 12, 2023, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MG's vehicle was drivable following the accident. The police report further indicated that MG was not injured and did not complain of any pain at the scene. In keeping with the fact that MG was not injured, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MG by Ravipati on January 24, 2023, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xx) On February 9, 2023, an Insured named DC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that DC's vehicle was drivable following the accident. The police report further indicated that DC was not injured and did not complain of any pain at the scene. In keeping with the fact that DC was not injured, DC did not visit any hospital emergency room following the accident. To the extent that DC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of DC by Ravipati on February 11, 2023, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxi) On October 3, 2023, an Insured named ES was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that ES's vehicle was drivable following the accident. The police report further indicated that ES was not injured and did not complain of any pain at the scene. In keeping with the fact that ES was not injured, ES did not visit any hospital emergency room following the accident. To the extent that ES experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of ES by Douglas on October 9, 2023, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using

CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxii) On November 3, 2023, an Insured named JB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JB's vehicle was drivable following the accident. The police report further indicated that JB was not injured and did not complain of any pain at the scene. In keeping with the fact that JB was not injured, JB did not visit any hospital emergency room following the accident. To the extent that JB experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JB by Buchanan on November 6, 2023, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxiii) On February 17, 2024, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JO's vehicle was drivable following the accident. The police report further indicated that JO was not injured and did not complain of any pain at the scene. In keeping with the fact that JO was not injured, JO did not visit any hospital emergency room following the accident. To the extent that JO experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JO by Echevarria on March 1, 2024, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxiv) On February 18, 2024, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene. In keeping with the fact that JC was not injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JC by Echevarria on February 20, 2024, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT

code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxv) On March 20, 2024, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MS's vehicle was drivable following the accident. The police report further indicated that MS was not injured and did not complain of any pain at the scene. In keeping with the fact that MS was not injured, MS did not visit any hospital emergency room following the accident. To the extent that MS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MS by Echevarria on April 9, 2024, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxvi) On April 14, 2024, an Insured named CC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CC's vehicle was drivable following the accident. The police report further indicated that CC was not injured and did not complain of any pain at the scene. In keeping with the fact that CC was not injured, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CC by Seidler-Brennan on April 16, 2024, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxvii) On October 2, 2024, an Insured named DR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that DR's vehicle was drivable following the accident. The police report further indicated that DR was not injured and did not complain of any pain at the scene. In keeping with the fact that DR was not injured, DR did not visit any hospital emergency room following the accident. To the extent that DR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of DR by Seidler-Brennan on October 22, 2024, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT

code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxviii) On November 22, 2024, an Insured named PG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that PG's vehicle was drivable following the accident. The police report further indicated that PG was not injured and did not complain of any pain at the scene. In keeping with the fact that PG was not injured, PG did not visit any hospital emergency room following the accident. To the extent that PG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of PG by Seidler-Brennan on November 26, 2024, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxix) On December 12, 2024, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MC by Douglas on December 13, 2024, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Ravipati billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxx) On March 22, 2025, an Insured named CC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CC's vehicle was drivable following the accident. The police report further indicated that CC was not injured and did not complain of any pain at the scene. In keeping with the fact that CC was not injured, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CC by Ravipati on March 26, 2025, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code

99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

124. These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "3", the respective Defendants routinely falsely represented that the Insureds presented with problems of moderate severity and moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)    Misrepresentations Regarding the Amount of Time Spent on the Purported Initial Examinations**

125. What is more, in the claims identified in Exhibits "1" – "3", the charges for the initial examinations under CPT codes 99203 and 99204 misrepresented and exaggerated the amount of time that the examining health care practitioners spent performing the examinations.

126. Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the physician or other health care practitioner who performed the underlying examination spent at least 30 minutes performing the examination.

127. Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the physician or other health care

practitioner who performed the underlying examination spent at least 45 minutes performing the examination.

128. As set forth in Exhibits "1" – "3", the respective Defendants typically billed their purported initial examinations to GEICO through Premier, Bayview, and Family Health under CPT codes 99203 and 99204, and thereby represented that the physicians and other practitioners who purported to perform the examinations spent at least 30 minutes (when billed under CPT code 99203) or 45 minutes (when billed under CPT code 99204) performing the examinations.

129. In fact, in the initial examinations identified in Exhibits "1" – "3", the health care practitioners who purported to perform the initial examinations on behalf of Premier, Bayview, and Family Health – usually Ravipati, Seidler-Brennan, Bley, Badala, Douglas, Patel, Echevarria, or Buchanan – never spent more than 15-20 minutes when performing the examinations, much less 30-45 minutes.

130. For instance, and in keeping with the fact that the initial examinations purportedly provided through Premier, Bayview, and Family Health did not involve more than 15-20 minutes of time to perform, the examining practitioners – usually Ravipati, Seidler-Brennan, Bley, Badala, Douglas, Patel, Echevarria, or Buchanan – used template forms in purporting to conduct the initial examinations.

131. All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

132.   These brief interviews and limited examinations did not require the examining health care practitioners to spend more than 15-20 minutes performing the putative initial examinations.

133.   Moreover, the purported initial examinations in the claims identified in Exhibits "1" – "3" were not legitimately performed at all, inasmuch as the outcomes of the putative examinations were pre-determined to result in false soft tissue injury diagnoses and medically unnecessary treatment recommendations, regardless of the Insureds' actual individual circumstances and presentation. These false and predetermined examinations did not require the examining practitioners to spend more than 15-20 minutes performing the putative initial examinations.

134.   In the claims for initial examinations that are identified in Exhibits "1" - "3", the Defendants routinely misrepresented the amount of time that was spent in performing the initial examinations because lengthier examinations that are billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

**(iii)   Misrepresentations Regarding the Extent of the Medical Decision-Making During the Purported Initial Examinations**

135.   Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination, namely straightforward, low complexity, moderate complexity, and high complexity medical decision-making.

47

136. Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

137. Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

138. For an initial patient examination to legitimately entail "low complexity" medical decision-making, the examination typically must, among other things: (i) involve review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) there typically must be at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

139. Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

48

140. For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must – among other things – involve: (i) chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) review and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

141. In the claims for initial examinations identified in Exhibits "1" – "3", when the Defendants billed GEICO for putative initial examinations under CPT codes 99203 and 99204, they falsely represented that the practitioners who purported to perform the examinations on behalf of Premier, Bayview, and Family Health engaged in some legitimate low or moderate complexity medical decision-making in connection with the examinations.

142. In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

143. Rather, in the claims for initial examinations identified in Exhibits "1" - "3": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) the Defendants did not

consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead provided substantially similar, pre-determined sprain/strain or similar soft tissue injury "diagnoses" for almost every Insured, regardless of their true individual circumstances or presentation.

144.   For example:

(i)     On April 15, 2020, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that RM's vehicle was drivable following the accident. The police report further indicated that RM was not injured and did not complain of any pain at the scene. In keeping with the fact that RM was not seriously injured, RM did not visit any hospital emergency room following the accident. To the extent that RM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on April 23, 2020, Ravipati purported to conduct an initial examination of RM at Premier. To the extent that Ravipati performed the examination in the first instance, Ravipati did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ravipati did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ravipati provided RM with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither RM's presenting problems, nor the treatment plan provided to RM by Premier, Miller, and Ravipati presented any risk of significant complications, morbidity, or mortality. To the contrary, RM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Premier, Miller, and Ravipati consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to RM. Even so, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ravipati engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)    On May 18, 2020, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured

50

and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on May 19, 2020, Ravipati purported to conduct an initial examination of CM at Premier. To the extent that Ravipati performed the examination in the first instance, Ravipati did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ravipati did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ravipati provided CM with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither CM's presenting problems, nor the treatment plan provided to CM by Premier, Miller, and Ravipati presented any risk of significant complications, morbidity, or mortality. To the contrary, CM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Premier, Miller, and Ravipati consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CM. Even so, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ravipati engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)    On June 10, 2020, an Insured named IY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that IY's vehicle was drivable following the accident. The police report further indicated that IY was not injured and did not complain of any pain at the scene. In keeping with the fact that IY was not seriously injured, IY did not visit any hospital emergency room following the accident. To the extent that IY experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on June 12, 2020, Douglas purported to conduct an initial examination of IY at Bayview. To the extent that Douglas performed the examination in the first instance, Douglas did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Douglas did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Douglas provided IY with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither IY's presenting

problems, nor the treatment plan provided to IY by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Douglas presented any risk of significant complications, morbidity, or mortality. To the contrary, IY did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Douglas consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to IY. Even so, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Douglas engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)     On June 23, 2020, an Insured named KP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that KP's vehicle was drivable following the accident. The police report further indicated that KP was not injured and did not complain of any pain at the scene. In keeping with the fact that KP was not seriously injured, KP did not visit any hospital emergency room following the accident. To the extent that KP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on June 24, 2020, Ravipati purported to conduct an initial examination of KP at Family Health. To the extent that Ravipati performed the examination in the first instance, Ravipati did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ravipati did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ravipati provided KP with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither KP's presenting problems, nor the treatment plan provided to KP by Family Health, Pujols, and Ravipati presented any risk of significant complications, morbidity, or mortality. To the contrary, KP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Family Health, Pujols, and Ravipati consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to KP. Even so, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ravipati engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)      On June 29, 2020, an Insured named BO was involved in an automobile

accident. The contemporaneous police report indicated that the accident was a low-impact collision and that BO's vehicle was drivable following the accident. The police report further indicated that BO was not injured and did not complain of any pain at the scene. In keeping with the fact that BO was not seriously injured, BO did not visit any hospital emergency room following the accident. To the extent that BO experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on July 7, 2020, Douglas purported to conduct an initial examination of BO at Bayview. To the extent that Douglas performed the examination in the first instance, Douglas did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Douglas did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Douglas provided BO with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither BO's presenting problems, nor the treatment plan provided to BO by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari presented any risk of significant complications, morbidity, or mortality. To the contrary, BO did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to BO. Even so, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ravipati engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)    On September 22, 2020, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not seriously injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on September 22, 2020, Ravipati purported to conduct an initial examination of JG at Family Health. To the extent that Ravipati performed the examination in the first instance, Ravipati did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in

53

connection with the examination. Moreover, Ravipati did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ravipati provided JG with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither JG's presenting problems, nor the treatment plan provided to JG by Family Health, Pujols, and Ravipati presented any risk of significant complications, morbidity, or mortality. To the contrary, JG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Family Health, Pujols, and Ravipati consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JG. Even so, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ravipati engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)    On November 18, 2020, an Insured named ST was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that ST's vehicle was drivable following the accident. The police report further indicated that ST was not injured and did not complain of any pain at the scene. In keeping with the fact that ST was not seriously injured, ST did not visit any hospital emergency room following the accident. To the extent that ST experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on November 23, 2020, Douglas purported to conduct an initial examination of ST at Bayview. To the extent that Douglas performed the examination in the first instance, Douglas did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Douglas did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Douglas provided ST with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither ST's presenting problems, nor the treatment plan provided to ST by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Douglas presented any risk of significant complications, morbidity, or mortality. To the contrary, ST did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Douglas consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to ST. Even so, Bayview, Salvia,

J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Douglas engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)  On December 11, 2020, an Insured named AF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AF's vehicle was drivable following the accident. The police report further indicated that AF was not injured and did not complain of any pain at the scene. In keeping with the fact that AF was not seriously injured, AF did not visit any hospital emergency room following the accident. To the extent that AF experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on December 15, 2020, Douglas purported to conduct an initial examination of AF at Bayview. To the extent that Douglas performed the examination in the first instance, Douglas did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Douglas did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Douglas provided AF with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither AF's presenting problems, nor the treatment plan provided to AF by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Douglas presented any risk of significant complications, morbidity, or mortality. To the contrary, AF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Douglas consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AF. Even so, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Douglas engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)  On January 18, 2021, an Insured named IR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that IR's vehicle was drivable following the accident. The police report further indicated that IR was not injured and did not complain of any pain at the scene. In keeping with the fact that IR was not seriously injured, IR did not visit any hospital emergency room following the accident. To the extent that IR

experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on January 19, 2021, Douglas purported to conduct an initial examination of IR at Bayview. To the extent that Douglas performed the examination in the first instance, Douglas did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Douglas did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Douglas provided IR with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither IR's presenting problems, nor the treatment plan provided to IR by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari presented any risk of significant complications, morbidity, or mortality. To the contrary, IR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Douglas consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to IR. Even so, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Douglas engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)     On March 14, 2021, an Insured named EA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that EA's vehicle was drivable following the accident. The police report further indicated that EA was not injured and did not complain of any pain at the scene. In keeping with the fact that EA was not seriously injured, EA did not visit any hospital emergency room following the accident. To the extent that EA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on March 25, 2021, Ravipati purported to conduct an initial examination of EA at Premier. To the extent that Ravipati performed the examination in the first instance, Ravipati did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ravipati did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ravipati provided EA with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither EA's presenting problems, nor the treatment plan provided to EA by Premier, Miller, and

Ravipati presented any risk of significant complications, morbidity, or mortality. To the contrary, EA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Premier, Miller, and Ravipati consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to EA. Even so, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ravipati engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)   On June 23, 2021, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on June 24, 2021, Ravipati purported to conduct an initial examination of AS at Family Health. To the extent that Ravipati performed the examination in the first instance, Ravipati did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ravipati did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ravipati provided AS with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither AS's presenting problems, nor the treatment plan provided to AS by Family Health, Pujols, and Ravipati presented any risk of significant complications, morbidity, or mortality. To the contrary, AS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Family Health, Pujols, and Ravipati consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AS. Even so, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ravipati engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xii)   On September 13, 2021, an Insured named VP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that VP's vehicle was drivable following the accident. The police report further indicated that

VP was not injured and did not complain of any pain at the scene. In keeping with the fact that VP was not seriously injured, VP did not visit any hospital emergency room following the accident. To the extent that VP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on September 14, 2021, Buchanan purported to conduct an initial examination of VP at Family Health. To the extent that Buchanan performed the examination in the first instance, Buchanan did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Buchanan did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Buchanan provided VP with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither VP's presenting problems, nor the treatment plan provided to VP by Family Health, Pujols, Ravipati, and Buchanan presented any risk of significant complications, morbidity, or mortality. To the contrary, VP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Family Health, Pujols, Ravipati, and Buchanan consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to VP. Even so, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Buchanan engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiii)  On February 22, 2021, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured and did not complain of any pain at the scene. In keeping with the fact that LS was not seriously injured, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on March 2, 2021, Douglas purported to conduct an initial examination of LS at Bayview. To the extent that Douglas performed the examination in the first instance, Douglas did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Douglas did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Douglas provided LS with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she

58

provided to other Insureds. Furthermore, neither LS's presenting problems, nor the treatment plan provided to LS by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Douglas presented any risk of significant complications, morbidity, or mortality. To the contrary, LS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Douglas consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LS. Even so, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Douglas engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiv)    On April 3, 2022, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and did not complain of any pain at the scene. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on April 6, 2022, Patel purported to conduct an initial examination of JH at Bayview. To the extent that Patel performed the examination in the first instance, Patel did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Patel did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Patel provided JH with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither JH's presenting problems, nor the treatment plan provided to JH by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Patel presented any risk of significant complications, morbidity, or mortality. To the contrary, JH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Patel consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JH. Even so, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Patel engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xv)    On April 12, 2022, an Insured named IA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that IA's vehicle was drivable following the accident. The police report further indicated that IA was not injured and did not complain of any pain at the scene. In keeping with the fact that IA was not seriously injured, IA did not visit any hospital emergency room following the accident. To the extent that IA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on April 14, 2022, Douglas purported to conduct an initial examination of IA at Bayview. To the extent that Douglas performed the examination in the first instance, Douglas did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Douglas did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Douglas provided IA with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither IA's presenting problems, nor the treatment plan provided to IA by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Douglas presented any risk of significant complications, morbidity, or mortality. To the contrary, IA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Douglas consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to IA. Even so, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Douglas engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xvi)   On April 23, 2022, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured and did not complain of any pain at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on May 2, 2022, Ravipati purported to conduct an initial examination of MM at Premier. To the extent that Ravipati performed the examination in the first

instance, Ravipati did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ravipati did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ravipati provided MM with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither MM's presenting problems, nor the treatment plan provided to MM by Premier, Miller, and Ravipati presented any risk of significant complications, morbidity, or mortality. To the contrary, MM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Premier, Miller, and Ravipati consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MM. Even so, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ravipati engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xvii) On January 13, 2023, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MG's vehicle was drivable following the accident. The police report further indicated that MG was not injured and did not complain of any pain at the scene. In keeping with the fact that MG was not seriously injured, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on January 24, 2023, Ravipati purported to conduct an initial examination of MG at Family Health. To the extent that Ravipati performed the examination in the first instance, Ravipati did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ravipati did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ravipati provided MG with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither MG's presenting problems, nor the treatment plan provided to MG by Family Health, Pujols, and Ravipati presented any risk of significant complications, morbidity, or mortality. To the contrary, MG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Family Health, Pujols, and Ravipati consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MG. Even so, Family Health, Pujols, and

61

Ravipati billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ravipati engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xviii) On October 3, 2023, an Insured named ES was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that ES's vehicle was drivable following the accident. The police report further indicated that ES was not injured and did not complain of any pain at the scene. In keeping with the fact that ES was not seriously injured, ES did not visit any hospital emergency room following the accident. To the extent that ES experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on October 4, 2023, Douglas purported to conduct an initial examination of ES at Bayview. To the extent that Douglas performed the examination in the first instance, Douglas did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Douglas did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Douglas provided ES with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither ES's presenting problems, nor the treatment plan provided to ES by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari presented any risk of significant complications, morbidity, or mortality. To the contrary, ES did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to ES. Even so, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Douglas engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xix) On February 17, 2024, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JO's vehicle was drivable following the accident. The police report further indicated that JO was not injured and did not complain of any pain at the scene. In keeping with the fact that JO was not seriously injured, JO did not visit any hospital emergency room following the accident. To the extent that

JO experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on March 1, 2024, Echevarria purported to conduct an initial examination of JO at Family Health. To the extent that Echevarria performed the examination in the first instance, Echevarria did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Echevarria did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Echevarria provided JO with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither JO's presenting problems, nor the treatment plan provided to JO by Family Health, Pujols, Ravipati, and Echevarria presented any risk of significant complications, morbidity, or mortality. To the contrary, JO did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Family Health, Pujols, Ravipati, and Echevarria consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JO. Even so, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Echevarria engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xx)     On February 18, 2024, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on February 20, 2024, Echevarria purported to conduct an initial examination of JC at Family Health. To the extent that Echevarria performed the examination in the first instance, Echevarria did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Echevarria did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Echevarria provided JC with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither JC's presenting problems, nor the treatment plan provided to JC by Family Health, Pujols, Ravipati, and

63

Echevarria presented any risk of significant complications, morbidity, or mortality. To the contrary, JC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Family Health, Pujols, Ravipati, and Echevarria consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JC. Even so, Family Health, Pujols, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Echevarria engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxi)   On October 2, 2024, an Insured named DR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that DR's vehicle was drivable following the accident. The police report further indicated that DR was not injured and did not complain of any pain at the scene. In keeping with the fact that DR was not seriously injured, DR did not visit any hospital emergency room following the accident. To the extent that DR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on October 22, 2024, Seidler-Brennan purported to conduct an initial examination of DR at Premier. To the extent that Seidler-Brennan performed the examination in the first instance, Seidler-Brennan did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Seidler-Brennan did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Seidler-Brennan provided DR with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither DR's presenting problems, nor the treatment plan provided to DR by Premier, Miller, Ravipati, and Seidler-Brennan presented any risk of significant complications, morbidity, or mortality. To the contrary, DR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Premier, Miller, Ravipati, and Seidler-Brennan consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DR. Even so, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Seidler-Brennan engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxii)  On November 4, 2024, an Insured named DL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that DL's vehicle was

drivable following the accident. The police report further indicated that DL was not injured and did not complain of any pain at the scene. In keeping with the fact that DL was not seriously injured, DL did not visit any hospital emergency room following the accident. To the extent that DL experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on November 11, 2024, Ravipati purported to conduct an initial examination of DL at Premier. To the extent that Ravipati performed the examination in the first instance, Ravipati did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ravipati did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ravipati provided DL with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither DL's presenting problems, nor the treatment plan provided to DL by Premier, Miller, and Ravipati presented any risk of significant complications, morbidity, or mortality. To the contrary, DL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Premier, Miller, and Ravipati consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DL. Even so, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ravipati engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxiii) On November 22, 2024, an Insured named PG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that PG's vehicle was drivable following the accident. The police report further indicated that PG was not injured and did not complain of any pain at the scene. In keeping with the fact that PG was not seriously injured, PG did not visit any hospital emergency room following the accident. To the extent that PG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on November 26, 2024, Seidler-Brennan purported to conduct an initial examination of PG at Premier. To the extent that Seidler-Brennan performed the examination in the first instance, Seidler-Brennan did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Seidler-Brennan did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Seidler-Brennan provided PG with substantially the same false list of

objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither PG's presenting problems, nor the treatment plan provided to PG by Premier, Miller, Ravipati, and Seidler-Brennan presented any risk of significant complications, morbidity, or mortality. To the contrary, PG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Premier, Miller, Ravipati, and Seidler-Brennan consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to PG. Even so, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Siedler-Brennan engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxiv) On February 1, 2025, an Insured named GL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that GL's vehicle was drivable following the accident. The police report further indicated that GL was not injured and did not complain of any pain at the scene. In keeping with the fact that GL was not seriously injured, GL did not visit any hospital emergency room following the accident. To the extent that GL experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on February 2, 2025, Douglas purported to conduct an initial examination of GL at Bayview. To the extent that Douglas performed the examination in the first instance, Douglas did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Douglas did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Douglas provided GL with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither GL's presenting problems, nor the treatment plan provided to GL by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Ravipati, and Douglas presented any risk of significant complications, morbidity, or mortality. To the contrary, GL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Ravipati, and Douglas consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to GL. Even so, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Ravipati billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Douglas engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxv) On March 22, 2025, an Insured named CC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CC's vehicle was drivable following the accident. The police report further indicated that CC was not injured and did not complain of any pain at the scene. In keeping with the fact that CC was not injured, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on March 26, 2025, Seidler-Brennan purported to conduct an initial examination of CC at Premier. To the extent that Seidler-Brennan performed the examination in the first instance, Seidler-Brennan did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Seidler-Brennan did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Seidler-Brennan provided CC with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither CC's presenting problems, nor the treatment plan provided to CC by Premier, Miller, and Ravipati presented any risk of significant complications, morbidity, or mortality. To the contrary, CC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Premier, Miller, and Ravipati consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CC. Even so, Premier, Miller, and Ravipati billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ravipati engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

145. These are only representative examples. In the claims identified in Exhibits "1" – "3", the respective Defendants routinely falsely represented that the purported examinations involved legitimate low or moderate complexity medical decision-making, when, in fact, they did not involve any legitimate medical decision-making at all.

146. In a legitimate clinical setting, when a patient presents with a soft tissue

injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

147. It is generally inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

148. Even so, in the claims identified in Exhibits "1" – "3", the Defendants routinely caused Insureds to immediately begin a course of physical therapy, often within days of their accidents, before the Insureds had first tried a more conservative course of treatment.

149. The Defendants routinely caused Insureds to immediately begin a course of physical therapy within days of their accidents because their putative initial examinations involved no legitimate medical decision-making and had pre-determined outcomes.

150. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

151. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

152. As set forth herein, in the claims identified in Exhibits "1" – "3", almost all of the Insureds whom the Defendants purported to treat were involved in relatively

minor accidents.

153.   It is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "3" would suffer substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

154.   It likewise is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "3" would present for an initial examination with substantially similar symptoms, and receive substantially similar diagnoses, on or about the exact same date after their underlying automobile accident.

155.   It is even more improbable – to the point of impossibility – that these kinds of patterns would recur with great frequency within the cohort of Insureds being treated at individual clinics such as those operated by the Defendants.

156.   Even so, in keeping with the fact that the Defendants' putative "diagnoses" were pre-determined and false, the Defendants frequently purported to provide examinations – on or about the same date – to two or more Insureds who had been involved in the same underlying accident, and at the conclusion of the examinations, caused the Insureds to be issued substantially similar, false "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" for the Insureds, despite the fact that they were differently situated.

157.   For example:

(i)   On May 18, 2020, four Insureds – CC, JR, AG, and RL – were involved

in the same automobile accident. Thereafter, all four Insureds presented at Premier for initial examinations on the exact same date, May 21, 2020. CC, JR, AG, and RL were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CC, JR, AG, and RL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premier, Miller, and Ravipati caused CC, JR, AG, and RL to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(ii)    On May 27, 2020, two Insureds – GG and LH – were involved in the same automobile accident. Thereafter, both Insureds presented at Bayview for initial examinations on the exact same date, May 29, 2020. GG and LH were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GG and LH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari caused GG and LH to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(iii)    On June 23, 2020, three Insureds – JB, JB, and KP – were involved in the same automobile accident. Thereafter, all three Insureds presented at Family Health for initial examinations on the exact same date, June 24, 2020. JB, JB, and KP were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JB, JB, and KP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Family Health, Pujols, and Ravipati caused JB, JB, and KP to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(iv)    On April 1, 2021, two Insureds – CD and DM – were involved in the same automobile accident. Thereafter, both Insureds presented at Family Health for initial examinations on the exact same date, April 1, 2021. CD and DM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from

different positions in the vehicle. To the extent that CD and DM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Family Health, Pujols, and Ravipati caused CD and DM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(v)   On April 22, 2021, two Insureds – HM and VL – were involved in the same automobile accident. Thereafter, both Insureds presented at Premier for initial examinations on the exact same date, April 26, 2021. HM and VL were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that HM and VL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premier, Miller, and Ravipati caused HM and VL to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(vi)   On July 23, 2021, two Insureds – TH and TJ – were involved in the same automobile accident. Thereafter, both Insureds presented at Premier for initial examinations on the exact same date, July 29, 2021. TH and TJ were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that TH and TJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premier, Miller, and Ravipati caused TH and TJ to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(vii)   On August 9, 2021, two Insureds – CM and EF – were involved in the same automobile accident. Thereafter, both Insureds presented at Premier for initial examinations on the exact same date, August 17, 2021. CM and EF were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CM and EF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premier, Miller, and Ravipati caused CM and EF to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(viii)  On October 6, 2021, two Insureds – BR and RM – were involved in the same automobile accident. Thereafter, both Insureds presented at Bayview for initial examinations on the exact same date, October 8, 2021. BR and RM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that BR and RM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari caused BR and RM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(ix)  On December 11, 2021, two Insureds – MS and MS – were involved in the same automobile accident. Thereafter, both Insureds presented at Bayview for initial examinations on the exact same date, December 22, 2021. MS and MS were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MS and MS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari caused MS and MS to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(x)  On December 11, 2021, two Insureds – PG and CD – were involved in the same automobile accident. Thereafter, both Insureds presented at Family Health for initial examinations on the exact same date, December 13, 2021. PG and CD were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that PG and CD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Family Health, Pujols, and Ravipati caused PG and CD to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xi)  On December 12, 2021, two Insureds – CP and RP – were involved in the same automobile accident. Thereafter, both Insureds presented at Premier for initial examinations on the exact same date, January 13,

2022. CP and RP were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CP and RP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premier, Miller, and Ravipati caused CP and RP to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xii)    On December 19, 2021, two Insureds – MC and NB – were involved in the same automobile accident. Thereafter, both Insureds presented at Family Health for initial examinations on the exact same date, December 28, 2021. MC and NB were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MC and NB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Family Health, Pujols, and Ravipati caused MC and NB to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xiii)   On January 9, 2022, two Insureds – KS and RS – were involved in the same automobile accident. Thereafter, both Insureds presented at Premier for initial examinations on the exact same date, January 12, 2022. KS and RS were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that KS and RS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premier, Miller, and Ravipati caused KS and RS to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xiv)    On April 18, 2022, two Insureds – DC and UV – were involved in the same automobile accident. Thereafter, both Insureds presented at Bayview for initial examinations on the exact same date, April 21, 2022. DC and UV were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DC and UV suffered any injuries at all in their accident, the injuries were different. Even so,

at the conclusion of the purported initial examinations, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari caused DC and UV to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xv) On July 16, 2022, two Insureds – CA and KA – were involved in the same automobile accident. Thereafter, both Insureds presented at Bayview for initial examinations on the exact same date, July 19, 2022. CA and KA were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CA and KA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari caused CA and KA to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xvi) On September 15, 2022, three Insureds – IG, EM, and EJ – were involved in the same automobile accident. Thereafter, all three Insureds presented at Bayview for initial examinations on the exact same date, October 4, 2022. IG, EM, and EJ were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EG, EM, and EJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari caused IG, EM, and EJ to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xvii) On January 2, 2023, four Insureds – DB, KV, AM, and DM – were involved in the same automobile accident. Thereafter, all for Insureds presented at Family Health for initial examinations on the exact same date, January 10, 2023. DB, KV, AM, and DM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DB, KV, AM, and DM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Family Health, Pujols, and Ravipati caused DB, KV, AM, and DM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a

substantially similar course of medically unnecessary treatment.

(xviii) On January 25, 2023, two Insureds – IN and FA – were involved in the same automobile accident. Thereafter, both Insureds presented at Family Health for initial examinations on the exact same date, February 6, 2023. IN and FA were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that IN and FA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Family Health, Pujols, and Ravipati caused IN and FA to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xix)  On April 4, 2023, two Insureds – DR and DR – were involved in the same automobile accident. Thereafter, both Insureds presented at Premier for initial examinations on the exact same date, April 13, 2023. DR and DR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DR and DR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premier, Miller, and Ravipati caused DR and DR to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xx)   On March 24, 2023, two Insureds – MR and MM – were involved in the same automobile accident. Thereafter, both Insureds presented at Bayview for initial examinations on the exact same date, April 3, 2023. MR and MM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MR and MM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari caused MR and MM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxi)  On June 12, 2023, three Insureds – ES, EB, and TP – were involved in the same automobile accident. Thereafter, all three Insureds presented at Premier for initial examinations on or about the exact same date, June

13, 2023, and June 15, 2023. ES, EB, and TP were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that ES, EB, and TP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premier, Miller, and Ravipati caused ES, EB, and TP to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxii) On October 11, 2023, three Insureds – AK, AK, and MK – were involved in the same automobile accident. Thereafter, all three Insureds presented at Premier for initial examinations on the exact same date, October 17, 2023. AK, AK, and MK were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AK, AK, and MK suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premier, Miller, and Ravipati caused AK, AK, and MK to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxiii) On February 18, 2024, two Insureds – JC and IM – were involved in the same automobile accident. Thereafter, both Insureds presented at Family Health for initial examinations on the exact same date, February 20, 2024. JC and IM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JC and IM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Family Health, Pujols, and Ravipati caused JC and IM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxiv) On April 1, 2024, three Insureds – WG, JS, and LN – were involved in the same automobile accident. Thereafter, all three Insureds presented at Family Health for initial examinations on the exact same date, April 5, 2024. WG, JS, and LN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that WG, JS, and LN suffered any injuries at all in their accident, the injuries were

different. Even so, at the conclusion of the purported initial examinations, Family Health, Pujols, and Ravipati caused WG, JS, and LN to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxv) On May 24, 2024, three Insureds – JM, EM, and AM – were involved in the same automobile accident. Thereafter, all three Insureds presented at Bayview for initial examinations on the exact same date, June 3, 2024. JM, EM, and AM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JM, EM, and AM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Ravipati caused JM, EM, and AM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxvi) On August 16, 2024, two Insureds – AR and OL – were involved in the same automobile accident. Thereafter, both Insureds presented at Bayview for initial examinations on the exact same date, August 21, 2024. AR and OL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AR and OL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Ravipati caused AR and OL to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxvii) On October 17, 2024, two Insureds – JP and MJ – were involved in the same automobile accident. Thereafter, both Insureds presented at Family Health for initial examinations on the exact same date, November 25, 2023. JP and MJ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JP and MJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Family Health, Pujols, and Ravipati caused JP and MJ to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary

treatment.

(xxviii) On November 15, 2024, two Insureds – TS and EM – were involved in the same automobile accident. Thereafter, both Insureds presented at Premier for initial examinations on the exact same date, November 21, 2024. TS and EM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that TS and EM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premier, Miller, and Ravipati caused TS and EM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxix) On January 9, 2025, two Insureds – SP and JP – were involved in the same automobile accident. Thereafter, both Insureds presented at Premier for initial examinations on the exact same date, January 13, 2025. SP and JP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that SP and JP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Ravipati caused SP and JP to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxx) On May 27, 2025, two Insureds – CB and AP – were involved in the same automobile accident. Thereafter, both Insureds presented at Premier for initial examinations on the exact same date, May 29, 2025. CB and AP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CB and AP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premier, Miller, and Ravipati caused CB and AP to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

158. These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" – "3", the Defendants frequently

78

caused substantially similar "diagnoses" to be issued – on or about the same date – to more than one Insured involved in a single accident, and caused the Insureds to be recommended a substantially similar course of medically unnecessary "treatment", despite the fact that each of the Insureds was differently situated and, in any case, did not require the treatment.

159. In the claims for initial examinations identified in Exhibits "1" – "3", the Defendants routinely falsely represented that the initial examinations involved medical decision-making of low or moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99203 and 99204, because CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that do not require any complex medical decision-making at all.

160. In actuality, the initial examinations did not involve any legitimate medical decision-making at all, because the purported "results" of the examinations were pre-determined, falsified, and designed to provide a false justification for the laundry list of other Fraudulent Services that the Defendants purported to provide.

161. In the claims for initial examinations identified in Exhibits "1" – "3", the Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, they were neither lawfully provided nor reimbursable, because:

    (i)    the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)   the charges for putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   Premier, Bayview, and Family Health were never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the practices were unlawfully operated in violation of Florida Law.

## 2.   The Defendants' Fraudulent Charges for Follow-Up Examinations

162.   In addition to the fraudulent initial examinations, the Defendants often purported to subject the Insureds in the claims identified in Exhibits "1" – "3" to one or more fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

163.   The purported follow-up examinations then were billed to GEICO in the following manner:

(i)   in the claims identified in Exhibit "1", Premier, Miller, and Ravipati typically billed GEICO under CPT codes 99212 and 99213 for the follow-up examinations that they purported to provide;

(ii)   in the claims identified in Exhibit "2", Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati typically billed GEICO under CPT codes 99213 and 99214 for the follow-up examinations that they purported to provide; and

(iii)   in the claims identified in Exhibit "3", Family Health, Pujols, and Ravipati typically billed GEICO under CPT codes 99212 and 99213 for the follow-up examinations that they purported to provide.

164.   As set forth herein, the charges for the follow-up examinations identified in Exhibits "1" – "3" misrepresented the nature, extent, and results of the follow-up examinations, and also falsely represented that the Defendants were operating in accordance with Florida law and were eligible to receive PIP reimbursement in the

first place.

**(i)    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems in Claims for Follow-Up Examinations Under CPT Codes 99213 and 99214**

165.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically represents – among other things – that the patient presented with problems of low to moderate severity at the time of the examination.

166.    The CPT Assistant provides various clinical examples of low to moderate severity presenting problems that would support the use of CPT code 99213 to bill for a follow-up patient examination, including:

(i)     Follow-up visit with a 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

167.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity

presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

168.   Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up patient examination represents that the insured presented with problems of moderate to high severity.

169.   The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99214 to bill for a follow-up patient examination, including:

(i)   Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)   Office evaluation of 28-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)   Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)   Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)   Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman,

established patient. (Urology / General Surgery / Internal Medicine / Family Medicine)

(viii)  Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

170.  Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

171.  By contrast, and as set forth herein, to the extent that the Insureds in the claims identified in Exhibits "1" – "3" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

172.  Minor soft tissue injuries such as strains and sprains almost always resolve after a short course of conservative treatment or no treatment at all.

173.  By the time the Insureds in the claims identified in Exhibits "1" – "3" presented for their putative follow-up examinations – typically weeks or months after their minor accidents – the Insured either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

174.  Even so, in the claims for the follow-up examinations identified in Exhibits "1" – "3", the Defendants made the following misrepresentations:

(i)  When billing for putative follow-up examinations using CPT code 99213

83

in the claims identified in Exhibits "1" – "3", the Defendants falsely represented that the Insureds presented with problems of low to moderate severity,  when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all at the time of the follow-up examinations.

(ii)   When billing GEICO for putative follow-up examinations using CPT code 99214 in the claims identified in Exhibit "2", Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all at the time of the follow-up examinations.

175.   In the claims for follow-up examinations under CPT codes 99213 and 99214 that are identified in Exhibits "1" – "3", the Defendants routinely falsely represented that the Insureds presented with problems of either low to moderate severity (when billed under CPT code 99213) or moderate to high severity (when billed under CPT code 99214) in order to: (i) create a false basis for their charges for the examinations under CPT codes 99213 and 99214, because examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)   Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

176.   What is more, in the claims for follow-up examinations identified in Exhibits "1" – "3", neither Ravipati, Seidler-Brennan, Bley, Badala, Douglas, Patel,

Echevarria, Buchanan, nor any other physician, chiropractor, or other health care practitioner associated with Premier, Bayview, or Family Health, took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

177.    Rather, Ravipati, Seidler-Brennan, Bley, Badala, Douglas, Patel, Echevarria, Buchanan, and other health care practitioners working at the respective Defendants' direction – simply: (i) reiterated the false, boilerplate, "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

178.    The putative "follow-up examinations" that the Defendants purported to provide to the Insureds in the claims identified in Exhibits "1" – "3" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the supposed "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Premier, Bayview, and Family Health's offices.

179.    In the claims for follow-up examinations identified in Exhibits "1" – "3", the Defendants routinely fraudulently misrepresented that the examinations were

lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   Premier, Bayview, and Family Health were never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinics were unlawfully operated in violation of Florida law.

3.     **The Defendants' Fraudulent and Unlawful Claims for "Physical Therapy" and Chiropractic Services**

180.    In addition to the fraudulent and unlawful initial examinations and follow-up examinations, the Defendants typically purported to subject each of the Insureds in the claims identified in Exhibits "1" – "3" to months of medically unnecessary physical therapy and chiropractic treatment.

181.    In the claims identified in Exhibit "1", Premier, Miller, and Ravipati typically billed the purported physical therapy and chiropractic services to GEICO under:

(i)     CPT code 97010, for putative hot/cold packs, typically resulting in a charge of $40.00 for each round of hot/cold packs they purported to provide;

(ii)    CPT code 97012, for putative mechanical traction, typically resulting in a charge of $46.00 for each round of mechanical traction they purported to provide;

(iii)   CPT code 97016 for putative vasopneumatic compression, typically

resulting in a charge of $56.00 for each round of vasopneumatic compression they purported to provide;

(iv) CPT code 97035 for putative ultrasound therapy, typically resulting in a charge of $30.00 for each round of ultrasound therapy they purported to provide;

(v) CPT code 97140, for putative manual therapy, typically resulting in in a charge of $62.00 for each round of neuromuscular reeducation they purported to provide;

(vi) CPT codes 98940 and 98941, for putative chiropractic manipulative treatment, typically resulting in charges between $60.00 and $80.00 for each round of chiropractic manipulative treatment they purported to provide; and

(vii) Health care Common Procedure Coding System ("HCPCS") code G0283, for putative electrical stimulation treatments, typically resulting in a charge of $45.00 for each round of electrical stimulation they purported to provide.

182. In the claims identified in Exhibit "2", Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati typically billed the purported physical therapy and chiropractic services to GEICO under:

(i) CPT code 97010, for putative hot/cold packs, typically resulting in charges between $13.00 and $16.72 for each round of hot/cold packs they purported to provide;

(ii) CPT code 97012, for putative mechanical traction, typically resulting in charges between $32.61 and $39.86 for each round of mechanical traction they purported to provide;

(iii) CPT code 97039 for putative physical therapy modalities, typically resulting in a charge of $19.50 for each round of physical therapy modalities they purported to provide;

(iv) CPT code 97110 for putative therapeutic exercises, typically resulting in charges between $67.54 and $80.39 for each round of therapeutic exercises they purported to provide;

87

(v)    CPT code 97112, for putative neuromuscular reeducation, typically resulting in charges between $77.38 and $92.15 for each round of neuromuscular reeducation they purported to provide;

(vi)    CPT code 98940, for putative chiropractic manipulative treatment, typically resulting in charges between $63.17 and $74.20 for each round of chiropractic manipulative treatment they purported to provide;

(vii)    HCPCS code G0283, for putative electrical stimulation treatments, typically resulting in charges between $27.12 and $36.87 for each round of electrical stimulation they purported to provide; and

(viii)    HCPCS code S8948 for putative low-level laser treatments, typically resulting in charges between $195.00 and $300.00 for each round of low-level laser treatment they purported to provide.

183.    In the claims identified in Exhibit "3", Family Health, Pujols, and Ravipati typically billed the purported physical therapy and chiropractic services to GEICO under:

(i)    CPT code 97010, for putative hot/cold packs, typically resulting in a charge of $20.00 for each round of hot/cold packs they purported to provide;

(ii)    CPT code 97012, for putative mechanical traction, typically resulting in a charge of $45.00 for each round of mechanical traction they purported to provide;

(iii)    CPT code 97014 for putative electrical stimulation, typically resulting in a charge of $30.00 for each round of electrical stimulation they purported to provide;

(iv)    CPT code 97035 for putative ultrasound therapy, typically resulting in charges between $25.00 and $29.00 for each round of ultrasound therapy they purported to provide;

(v)    CPT code 97140, for putative manual therapy, typically resulting in a charge of $59.30 for each round of neuromuscular reeducation they purported to provide; and

(vi)    CPT codes 98940 and 98941, for putative chiropractic manipulation,

typically resulting in charges between $45.82 and $70.00 for each round of chiropractic manipulation they purported to provide.

184.  In the claims for purported physical therapy and chiropractic services identified in Exhibits "1" – "3", the charges for physical therapy and chiropractic services were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

185.  In fact, and as set forth above, the Defendants never were eligible to collect PIP Benefits because of their fraudulent and unlawful activities, including violations of the Clinic Act, the No-Fault Law, the Physical Therapy Act, and the False and Fraudulent Insurance Claims Statute.

186.  Moreover, the Defendants never were eligible to collect PIP Benefits in connection with the purported physical therapy services identified in Exhibits "1" – "3", because the services were performed – to the extent that they were performed at all – by massage therapists and unlicensed/unsupervised personnel.

187.  What is more, in a legitimate clinical setting, the individual physical therapy and chiropractic services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

188.  In keeping with the fact that the purported physical therapy and chiropractic services that were billed through Premier, Bayview, and Family Health to GEICO were not medically necessary, the Defendants did not tailor the physical therapy and chiropractic services they purported to provide to each Insured's individual circumstances and presentation.

189. There are a large number of individual types of physical therapy and chiropractic services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

190. However, the Defendants routinely purported to provide the same handful of physical therapy and chiropractic "treatments" to the Insureds in the claims identified in Exhibits "1" – "3", on substantially the same schedule, without regard for the Insureds' individual circumstances.

191. In the claims for physical therapy and chiropractic services identified in Exhibits "1" – "3", the Defendants routinely fraudulently misrepresented that the services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)    the services were medically unnecessary, and were provided without regard for the Insureds' true individual circumstances and presentation;

(ii)   the physical therapy services were performed by massage therapists and unlicensed/unsupervised personnel;

(iii)  the billing for the services misrepresented the identities of the actual treating practitioners; and

(iv)   the Defendants never were eligible to collect PIP Benefits in connection with the services in the first instance, inasmuch as they operated in violation of Florida law.

**4.    The Fraudulent and Unlawful Claims for HME**

192. As part of their fraudulent and unlawful schemes, the Defendants purported to provide many Insureds with HME – and particularly, rigid lower back braces known as lumbar-sacral orthoses ("LSOs").

90

193.   As set forth in Exhibit "1", Premier, Miller, and Ravipati billed GEICO for the HME under HCPCS code L0642, for purported custom-fitted LSOs with sagittal control, typically resulting in a charge of $793.54 for each unit they purported to provide.

194.   As set forth in Exhibit "2", Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati billed GEICO for the HME under L0627, for purported custom-fitted LSOs with sagittal control, typically resulting in charges between $1,066.93 and $1,232.35 for each unit they purported to provide.

195.   As set forth in Exhibit "3", Family Health, Pujols, and Ravipati billed GEICO for the HME under L0631, for purported custom-fitted LSOs with sagittal control,  typically resulting in charges between $1,486.29 and $1,650.00 for each unit they purported to provide.

196.   Like the Defendants' charges for the other Fraudulent Services, the charges for HME were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

197.   In fact, and as set forth herein, the Defendants were never eligible to collect PIP Benefits, inasmuch as Premier, Bayview, and Family Health operated in violation of Florida law.

198.   Moreover, the Defendants' charges for the HME identified in Exhibits "1" – "3" were also fraudulent in that they misrepresented the medical necessity of the HME – and in particular, the medical necessity of rigid LSOs.

199.   A rigid LSO is a custom-fitted lower back brace designed to restrict the

movement of a patient's torso and support the patient's lumbar spine. Because of its rigidity and requirement placement on a patient's lower back, a rigid LSO must be custom-fitted in order for it to be properly utilized by the patient.

200. In a legitimate clinical setting, a rigid LSO is reserved for patients who exhibit spinal instability or for patients who have recently undergone spinal surgery.

201. Because a rigid LSO is designed to limit the range of motion of a patient's lumbar spine, its prescription is inconsistent with the goals of treatment designed to restore and increase range of motion and functionality of the lumbar spine.

202. Along similar lines, the prescription and use of a rigid LSO would be counterproductive to the goals of physical therapy treatment modalities, which seek to restore movement and functionality of the lumbar spine.

203. In fact, the medically unnecessary prescription of a rigid LSO – and the resulting immobilization of the lumbar spine – may put a patient at considerable risk of weakening of the muscles or even atrophy of the muscles in the lower back.

204. Moreover, in a legitimate clinical setting, a rigid LSO should not simultaneously be prescribed with conservative treatment such as physical therapy.

205. The Insureds in the claims identified in Exhibits "1" – "3" did not suffer from spinal instability. In fact, virtually none of the Insureds in the claims identified in Exhibits "1" – "3" suffered any significant injuries at all as the result of their minor accidents, much less health problems requiring spinal surgery and subsequent immobilization of their spine.

206. The Insureds in the claims identified in Exhibits "1" – "3" typically had

not attempted and failed a legitimate course of conservative treatment prior to their receipt of a prescription for a rigid LSO.

207.    Even so, the Defendants routinely purported to provide medically unnecessary HME, including rigid LSOs, to the Insureds in the claims identified in Exhibits "1" – "3", despite the fact that:

(i)    the Insureds did not suffer from spinal instability and were not recovering from spinal surgery;

(ii)    the Defendants did not measure or fit the devices for the Insureds; and

(iii)    the Insureds were often concomitantly prescribed a course of physical therapy at Premier, Bayview, or Family Health, the supposed purpose of which was to restore the range of motion and functionality of – among other things – the Insureds' lumbar spines, and the use of a rigid LSO would be counterproductive to this goal.

208.    For example:

(i)    On February 4, 2020, an Insured named FR was involved in an automobile accident. On February 12, 2020, FR presented to Family Health for an initial examination. FR was immediately prescribed a course of physical therapy, which FR underwent at Family Health between February 5, 2020, and June 19, 2020. Nevertheless, FR was also prescribed medically unnecessary HME, despite the fact that FR: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Family Health, the putative purpose of which was to increase, rather than decrease, FR's range of motion. Family Health, Pujols, and Ravipati billed GEICO under HCPCS code L0631, seeking reimbursement of $1,486.29 for the medically unnecessary HME.

(ii)    On April 6, 2020, an Insured named LA was involved in an automobile accident. On April 6, 2020, LA presented to Premier for an initial examination. LA was immediately prescribed a course of physical therapy, which LA underwent at Premier between April 23, 2020, and December 15, 2020. Nevertheless, LA was also prescribed medically

unnecessary HME, despite the fact that LA: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Premier, the putative purpose of which was to increase, rather than decrease, LA's range of motion. Premier, Miller, and Ravipati billed GEICO under HCPCS code L0642, seeking reimbursement of $793.54 for the medically unnecessary HME.

(iii)    On April 26, 2020, an Insured named ZW was involved in an automobile accident. On May 4, 2020, ZW presented to Premier for an initial examination. ZW was immediately prescribed a course of physical therapy, which ZW underwent at Premier between May 6, 2020, and August 10, 2020. Nevertheless, ZW was also prescribed medically unnecessary HME, despite the fact that ZW: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Premier, the putative purpose of which was to increase, rather than decrease, ZW's range of motion. Premier, Miller, and Ravipati billed GEICO under HCPCS code L0642, seeking reimbursement of $793.54 for the medically unnecessary HME.

(iv)    On April 27, 2020, an Insured named TP was involved in an automobile accident. On May 13, 2020, TP presented to Premier for an initial examination. TP was immediately prescribed a course of physical therapy, which LA underwent at Premier between May 20, 2020, and June 17, 2020. Nevertheless, TP was also prescribed medically unnecessary HME, despite the fact that LA: (a) did not suffer from spinal instability and was not recovering TP spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Premier, the putative purpose of which was to increase, rather than decrease, TP's range of motion. Premier, Miller, and Ravipati billed GEICO under HCPCS code L0642, seeking reimbursement of $793.54 for the medically unnecessary HME.

(v)    On July 1, 2020, an Insured named RI was involved in an automobile accident. On July 7, 2020, RI presented to Bayview for an initial examination. RI was immediately prescribed a course of physical

94

therapy, which RI underwent at Bayview between July 7, 2020, and August 20, 2020. Nevertheless, RI was also prescribed medically unnecessary HME, despite the fact that RI: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Bayview, the putative purpose of which was to increase, rather than decrease, RI's range of motion. Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO under HCPCS code L0627, seeking reimbursement of $1,066.93 for the medically unnecessary HME.

(vi)    On January 18, 2021, an Insured named IR was involved in an automobile accident. On January 19, 2021, IR presented to Bayview for an initial examination. IR was immediately prescribed a course of physical therapy, which IR underwent at Bayview between January 19, 2021, and March 30, 2021. Nevertheless, IR was also prescribed medically unnecessary HME, despite the fact that IR: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Bayview, the putative purpose of which was to increase, rather than decrease, IR's range of motion. Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO under HCPCS code L0627, seeking reimbursement of $1,066.93 for the medically unnecessary HME.

(vii)   On April 6, 2021, an Insured named UI was involved in an automobile accident. On April 14, 2021, UI presented to Bayview for an initial examination. UI was immediately prescribed a course of physical therapy, which UI underwent at Bayview between April 14, 2021, and April 27, 2021. Nevertheless, UI was also prescribed medically unnecessary HME, despite the fact that UI: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Bayview, the putative purpose of which was to increase, rather than decrease, UI's range of motion. Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO under HCPCS code L0627, seeking reimbursement of $1,076.53 for the medically unnecessary HME.

(viii)  On April 7, 2021, an Insured named JM was involved in an automobile

accident. On April 9, 2020, JM presented to Family Health for an initial examination. JM was immediately prescribed a course of physical therapy, which JM underwent at Family Health between April 12, 2020, and September 11, 2020. Nevertheless, JM was also prescribed medically unnecessary HME, despite the fact that JM: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Family Health, the putative purpose of which was to increase, rather than decrease, JM's range of motion. Family Health, Pujols, and Ravipati billed GEICO under HCPCS code L0631, seeking reimbursement of $1,486.29 for the medically unnecessary HME.

(ix)    On April 22, 2021, an Insured named HM was involved in an automobile accident. On April 26, 2021, HM presented to Premier for an initial examination. HM was immediately prescribed a course of physical therapy, which HM underwent at Premier between April 27, 2021, and June 21, 2021. Nevertheless, HM was also prescribed medically unnecessary HME, despite the fact that HM: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Premier, the putative purpose of which was to increase, rather than decrease, HM's range of motion. Premier, Miller, and Ravipati billed GEICO under HCPCS code L0642, seeking reimbursement of $793.54 for the medically unnecessary HME.

(x)     On April 28, 2021, an Insured named MS was involved in an automobile accident. On May 3, 2021, MS presented to Family Health for an initial examination. MS was immediately prescribed a course of physical therapy, which MS underwent at Family Health between May 14, 2021 and December 6, 2021. Nevertheless, MS was also prescribed medically unnecessary HME, despite the fact that MS: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Family Health, the putative purpose of which was to increase, rather than decrease, MS's range of motion. Family Health, Pujols, and Ravipati billed GEICO under HCPCS code L0631, seeking reimbursement of $1,486.29 for the medically unnecessary HME.

(xi)     On August 3, 2021, an Insured named LR was involved in an automobile accident. On August 3, 2021, LR presented to Family Health for an initial examination. LR was immediately prescribed a course of physical therapy, which LR underwent at Family Health between August 3, 2021, and November 23, 2021. Nevertheless, LR was also prescribed medically unnecessary HME, despite the fact that LR: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Family Health, the putative purpose of which was to increase, rather than decrease, LR's range of motion. Family Health, Pujols, and Ravipati billed GEICO under HCPCS code L0631, seeking reimbursement of $1,486.29 for the medically unnecessary HME.

(xii)    On December 8, 2021, an Insured named AC was involved in an automobile accident. On December 11, 2021, AC presented to Family Health for an initial examination. AC was immediately prescribed a course of physical therapy, which AC underwent at Family Health between December 11, 2021, and January 26, 2022. Nevertheless, AC was also prescribed medically unnecessary HME, despite the fact that AC: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Family Health, the putative purpose of which was to increase, rather than decrease, AC's range of motion. Family Health, Pujols, and Ravipati billed GEICO under HCPCS code L0631, seeking reimbursement of $1,486.29 for the medically unnecessary HME.

(xiii)   On December 12, 2021, an Insured named AS was involved in an automobile accident. On December 20, 2021, AS presented to Premier for an initial examination. AS was immediately prescribed a course of physical therapy, which AS underwent at Premier between December 23, 2021, and March 31, 2022. Nevertheless, AS was also prescribed medically unnecessary HME, despite the fact that AS: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Premier, the putative purpose of which was to increase, rather than decrease, AS's range of motion. Premier, Miller, and Ravipati billed GEICO under

HCPCS code L0642, seeking reimbursement of $793.54 for the medically unnecessary HME.

(xiv) On March 10, 2022, an Insured named FW was involved in an automobile accident. On March 24, 2022, FW presented to Premier for an initial examination. FW was immediately prescribed a course of physical therapy, which FW underwent at Premier between March 24, 2022, and August 31, 2022. Nevertheless, FW was also prescribed medically unnecessary HME, despite the fact that FW: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Premier, the putative purpose of which was to increase, rather than decrease, FW's range of motion. Premier, Miller, and Ravipati billed GEICO under HCPCS code L0642, seeking reimbursement of $793.54 for the medically unnecessary HME.

(xv) On April 3, 2022, an Insured named MW was involved in an automobile accident. On April 14, 2022, MW presented to Bayview for an initial examination. MW was immediately prescribed a course of physical therapy, which MW underwent at Bayview between April 18, 2022, and December 21, 2023. Nevertheless, MW was also prescribed medically unnecessary HME, despite the fact that MW: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Bayview, the putative purpose of which was to increase, rather than decrease, MW's range of motion. Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO under HCPCS code L0627, seeking reimbursement of $1,133.70 for the medically unnecessary HME.

(xvi) On April 30, 2022, an Insured named RR was involved in an automobile accident. On May 13, 2022, RR presented to Premier for an initial examination. RR was immediately prescribed a course of physical therapy, which RR underwent at Premier between May 13, 2022 and July 16, 2022. Nevertheless, RR was also prescribed medically unnecessary HME, despite the fact that RR: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Premier, the putative

purpose of which was to increase, rather than decrease, RR's range of motion. Premier, Miller, and Ravipati billed GEICO under HCPCS code L0642, seeking reimbursement of $793.54 for the medically unnecessary HME.

(xvii)   On June 17, 2022, an Insured named LR was involved in an automobile accident. On June 20, 2022, LR presented to Family Health for an initial examination. LR was immediately prescribed a course of physical therapy, which LR underwent at Family Health between June 20, 2022, and July 25, 2022. Nevertheless, LR was also prescribed medically unnecessary HME, despite the fact that LR: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Family Health, the putative purpose of which was to increase, rather than decrease, LR's range of motion. Family Health, Pujols, and Ravipati billed GEICO under HCPCS code L0631, seeking reimbursement of $1,486.29 for the medically unnecessary HME.

(xviii)  On July 12, 2022, an Insured named GS was involved in an automobile accident. On July 13, 2022, GS presented to Family Health for an initial examination. GS was immediately prescribed a course of physical therapy, which GS underwent at Family Health between July 20, 2022, and January 10, 2023. Nevertheless, GS was also prescribed medically unnecessary HME, despite the fact that GS: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Family Health, the putative purpose of which was to increase, rather than decrease, GS's range of motion. Family Health, Pujols, and Ravipati billed GEICO under HCPCS code L0631, seeking reimbursement of $1,486.29 for the medically unnecessary HME.

(xix)    On January 13, 2023, an Insured named MG was involved in an automobile accident. On January 23, 2023, MG presented to Family Health for an initial examination. MG was immediately prescribed a course of physical therapy, which MG underwent at Family Health between January 26, 2023, and February 20, 2023. Nevertheless, MG was also prescribed medically unnecessary HME, despite the fact that MG: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not

yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Family Health, the putative purpose of which was to increase, rather than decrease, MG's range of motion. Family Health, Pujols, and Ravipati billed GEICO under HCPCS code L0631, seeking reimbursement of $1,486.29 for the medically unnecessary HME.

(xx)    On January 26, 2023, an Insured named AA was involved in an automobile accident. On February 2, 2023, AA presented to Bayview for an initial examination. AA was immediately prescribed a course of physical therapy, which AA underwent at Bayview between February 6, 2023, and May 1, 2023. Nevertheless, AA was also prescribed medically unnecessary HME, despite the fact that AA: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Bayview, the putative purpose of which was to increase, rather than decrease, AA's range of motion. Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO under HCPCS code L0627, seeking reimbursement of $1,133.70 for the medically unnecessary HME.

(xxi)   On March 17, 2023, an Insured named JG was involved in an automobile accident. On March 21, 2023, JG presented to Bayview for an initial examination. JG was immediately prescribed a course of physical therapy, which JG underwent at Bayview between March 22, 2023, and August 22, 2023. Nevertheless, JG was also prescribed medically unnecessary HME, despite the fact that JG: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Bayview, the putative purpose of which was to increase, rather than decrease, JG's range of motion. Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO under HCPCS code L0627, seeking reimbursement of $1,133.70 for the medically unnecessary HME.

(xxii)  On April 24, 2023, an Insured named CS was involved in an automobile accident. On May 5, 2023, CS presented to Bayview for an initial examination. CS was immediately prescribed a course of physical therapy, which CS underwent at Bayview between May 9, 2023, and July 14, 2023. Nevertheless, CS was also prescribed medically unnecessary HME, despite the fact that CS: (a) did not suffer from spinal instability

and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Bayview, the putative purpose of which was to increase, rather than decrease, CS's range of motion. Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO under HCPCS code L0627, seeking reimbursement of $1,232.35 for the medically unnecessary HME.

(xxiii) On April 28, 2023, an Insured named CK was involved in an automobile accident. On May 15, 2020, CK presented to Premier for an initial examination. CK was immediately prescribed a course of physical therapy, which CK underwent at Premier between May 15, 2023, and August 10, 2023. Nevertheless, CK was also prescribed medically unnecessary HME, despite the fact that CK: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Premier, the putative purpose of which was to increase, rather than decrease, CK's range of motion. Premier, Miller, and Ravipati billed GEICO under HCPCS code L0642, seeking reimbursement of $793.54 for the medically unnecessary HME.

(xxiv) On September 19, 2023, an Insured named ID was involved in an automobile accident. On September 27, 2023, ID presented to Family Health for an initial examination. ID was immediately prescribed a course of physical therapy, which ID underwent at Family Health between September 27, 2023, and February 22, 2024. Nevertheless, ID was also prescribed a medically unnecessary HME, despite the fact that ID: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Family Health, the putative purpose of which was to increase, rather than decrease, ID's range of motion. Family Health, Pujols, and Ravipati billed GEICO under HCPCS code L0631, seeking reimbursement of $1,486.29 for the medically unnecessary HME.

(xxv) On October 3, 2023, an Insured named ES was involved in an automobile accident. On October 9, 2023, ES presented to Bayview for an initial examination. ES was immediately prescribed a course of physical therapy, which ES underwent at Bayview between October 9, 2023, and

October 23, 2023. Nevertheless, ES was also prescribed medically unnecessary HME, despite the fact that ES: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Bayview, the putative purpose of which was to increase, rather than decrease, CS's range of motion. Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Zaccari billed GEICO under HCPCS code L0627, seeking reimbursement of $1,232.35 for the medically unnecessary HME.

(xxvi) On February 2, 2024, an Insured named JT was involved in an automobile accident. On February 12, 2024, JT presented to Family Health for an initial examination. JT was immediately prescribed a course of physical therapy, which JT underwent at Family Health between February 16, 2024, and September 13, 2024. Nevertheless, JT was also prescribed a medically unnecessary HME, despite the fact that JT: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Family Health, the putative purpose of which was to increase, rather than decrease, JT's range of motion. Family Health, Pujols, and Ravipati billed GEICO under HCPCS code L0631, seeking reimbursement of $1,486.29 for the medically unnecessary HME.

(xxvii) On March 14, 2024, an Insured named JS was involved in an automobile accident. On March 15, 2024, JS presented to Bayview for an initial examination. JS was immediately prescribed a course of physical therapy, which JS underwent at Bayview between March 18, 2024, and May 28, 2024. Nevertheless, JS was also prescribed medically unnecessary HME, despite the fact that JS: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Bayview, the putative purpose of which was to increase, rather than decrease, JS's range of motion. Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Ravipati billed GEICO under HCPCS code L0627, seeking reimbursement of $1,167.12 for the medically unnecessary HME.

(xxviii) On April 1, 2024, an Insured named LN was involved in an automobile accident. On April 5, 2024, LN presented to Family Health for an initial

examination. LN was immediately prescribed a course of physical therapy, which LN underwent at Family Health between April 5, 2024 and May 15, 2024. Nevertheless, LN was also prescribed a medically unnecessary HME, despite the fact that LN: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Family Health, the putative purpose of which was to increase, rather than decrease, LN's range of motion. Family Health, Pujols, and Ravipati billed GEICO under HCPCS code L0631, seeking reimbursement of $1,650.00 for the medically unnecessary HME.

(xxix) On August 16, 2024, an Insured named AR was involved in an automobile accident. On August 21, 2024, AR presented to Bayview for an initial examination. AR was immediately prescribed a course of physical therapy, which AR underwent at Bayview between August 26, 2024, and November 20, 2024. Nevertheless, AR was also prescribed medically unnecessary HME, despite the fact that AR: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Bayview, the putative purpose of which was to increase, rather than decrease, AR's range of motion. Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Ravipati billed GEICO under HCPCS code L0627, seeking reimbursement of $1,167.12 for the medically unnecessary HME.

(xxx) On November 19, 2024, an Insured named RJ was involved in an automobile accident. On November 19, 2024, RJ presented to Premier for an initial examination. RJ was immediately prescribed a course of physical therapy, which RJ underwent at Premier between November 19, 2024, and February 24, 2025. Nevertheless, RJ was also prescribed medically unnecessary HME, despite the fact that RJ: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Premier, the putative purpose of which was to increase, rather than decrease, RJ's range of motion. Premier, Miller, and Ravipati billed GEICO under HCPCS code L0642, seeking reimbursement of $775.00 for the medically unnecessary HME.

209. These are only representative examples. In the claims for the HME identified in Exhibits "1" – "3", the Defendants falsely represented that the prescribed HME was medically necessary, when in fact, it was not.

**5.    The Fraudulent and Unlawful Charges for Extracorporeal Shockwave Therapy at Premier**

210. Premier, Miller, and Ravipati also purported to subject many of the Insureds in the claims identified in Exhibit "1" to one or more sessions of extracorporeal shockwave therapy/ESWT during the course of their fraudulent treatment protocol.

211. Typically, Seidler-Brennan, Coleman, Badala, and Ravipati purported to perform the ESWT at Premier, which then was billed through Premier to GEICO under CPT code 0101T, almost always resulting in a charge of $590.00 for each ESWT treatment that supposedly was provided.

212. The charges for ESWT were fraudulent in that the ESWT was medically unnecessary and was provided – to the extent that it was provided at all – pursuant to false, boilerplate "diagnoses" that Premier, Miller, and Ravipati provided following their fraudulent examinations.

213. In keeping with the fact that Premier, Miller, and Ravipati's ESWT "treatments" were medically unnecessary: (i) ESWT has not been approved by the U.S. Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) Palmetto, a contractor for the Centers for Medicare and Medicaid Services ("CMS"), has published coverage guidance stating that ESWT is neither

104

reasonable nor necessary for the treatment of musculoskeletal conditions; and (iii) there are no legitimate peer-reviewed data that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

214. Even so, Premier, Miller, and Ravipati purported to provide medically unnecessary ESWT to many Insureds pursuant to their pre-determined fraudulent treatment protocol without regard to each Insured's individual complaints, symptoms, or presentation.

215. For example:

(i)     On or about June 7, 2022, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named MS.

(ii)    On or about September 16, 2022, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named AH.

(iii)   On January 10, 2023, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named DF.

(iv)    On or about February 22, 2023, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named LL.

(v)     On or about March 7, 2023, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named KC.

(vi)    On June 27, 2023, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named TM.

(vii)   On July 25, 2023, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named EB.

(viii)   On September 12, 2023, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named CR.

(ix)   On March 27, 2024, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named ML.

(x)   On May 2, 2024, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named ED.

(xi)   On July 11, 2024, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named RP.

(xii)   On December 19, 2024, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named VR.

(xiii)   On February 17, 2025, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was purportedly provided through Premier to an Insured named CS.

(xiv)   On August 5, 2025, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was supposedly provided through Premier to an Insured named SZ.

(xv)   On August 28, 2025, Premier, Miller, and Ravipati billed GEICO for medically unnecessary ESWT that was supposedly provided through Premier to an Insured named RR.

216.   These are only representative examples. In the claims for ESWT identified in Exhibit "1", Premier, Miller, and Ravipati routinely billed GEICO for medically unnecessary ESWT.

**6.   The Defendants' Violations of the False and Fraudulent Insurance Claims Statute**

217.   The Defendants knew that, if they made a legitimate, good-faith effort to

collect PIP insurance deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful scheme described herein. For instance, if the Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to Premier, Bayview, and Family Health on a regular basis for medically unnecessary treatment.

218.    Accordingly, and as part and parcel of their fraudulent and unlawful schemes, the Defendants unlawfully engaged in the general business practice of waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

219.    In keeping with this fact, in almost all of the thousands of bills (i.e., HCFA-1500 forms) submitted to GEICO through Premier, Bayview, and Family Health, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the Insureds.

220.    In the claims identified in Exhibits "1" – "3", the Defendants routinely and falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because the Defendants operated in violation of the False and Fraudulent Insurance Claims Statute.

**7.    The Unlawful Operation of the Bayview, Premier, and Family Health Clinics in Violation of the Clinic Act**

221.    Because Premier, Bayview, and Family Health each operated clinics that were subject to the Clinic Act: (i) Miller could not lawfully operate the Premier clinics;

(ii) Salvia, J. Ascensao, N. Ascensao, and Sanchez could not operate the Bayview clinics; and (iii) Pujols could not operate the Family Health clinic, unless they obtained clinic licenses for their respective clinics, and unless the clinics employed licensed physicians as their respective medical directors, who actually performed the required duties of clinic medical directors.

222. However, if Miller, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Pujols retained legitimate physicians to serve as the Premier, Bayview, and Family Health clinics' respective medical directors, any such legitimate physicians actually would be obligated to fulfill the statutory and regulatory requirements applicable to clinic medical directors, which would impede the Defendants' fraudulent and unlawful schemes.

223. Accordingly:

(i)     Miller recruited Ravipati, a licensed physician, who was willing to falsely pose as the legitimate medical director at the Premier clinics, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinics;

(ii)    Salvia, J. Ascensao, N. Ascensao, and Sanchez recruited Zaccari and Ravipati, licensed physicians, who were willing to falsely pose as the legitimate medical directors at the Bayview clinics, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinics; and

(iii)   Pujols recruited Ravipati, a licensed physician, who was willing to falsely pose as the legitimate medical director at the Family Health clinic, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic.

224. However, Zaccari was never a genuine medical director for the Bayview clinics, and Ravipati was never a genuine medical director for the Premier, Bayview,

108

and Family Health clinics.

225. Instead, from the beginning of Zaccari and Ravipati's association with Premier, Bayview, and Family Health, they ceded all day-to-day decision-making and oversight regarding health care services to Miller, Salvia, J. Ascensao, N. Ascensao, Sanchez, and Pujols, respectively.

226. In keeping with the fact that Zaccari and Ravipati were never genuine medical directors at Premier, Bayview, and Family Health, respectively, Zaccari and Ravipati never legitimately conducted systematic reviews of each of Premier, Bayview, and Family Health's respective billings to ensure that the billings were not fraudulent or unlawful, and instead permitted Premier, Bayview, and Family Health to operate in the fraudulent and unlawful manner described herein.

227. Moreover, Zaccari and Ravipati never ensured that all practitioners providing health care services at Premier, Bayview, and Family Health had active appropriate certification or licensure for the level of care being provided, and instead permitted Premier, Bayview, and Family Health to unlawfully bill for "physical therapy" services performed by massage therapists and unlicensed and unsupervised individuals.

228. Furthermore, Zaccari and Ravipati never legitimately served as clinic records owners at Premier, Bayview, and Family Health, respectively. Had they done so, they would have – among other things – taken corrective action to address the fact that medical records at Premier, Bayview, and Family Health routinely misrepresented the identities of the practitioners who actually performed or directly supervised the

purported "physical therapy" services at Premier, Bayview, and Family Health.

229.    In addition, though no Florida health care clinic may operate without the day-to-day supervision of a physician-medical director, Zaccari and Ravipati never provided legitimate, day-to-day supervision at Premier, Bayview, and Family Health, respectively, and – in fact – only occasionally were present at the respective clinics, if at all.

230.    For instance, Premier E. Fletcher's January 2020, April 2022, March 2024, and April 2024 clinic licensing applications represented that Ravipati was only present at Premier E. Fletcher once a week.

231.    Likewise Premier Bay Plaza's January 2020, February 2022, March 2024, and April 2024 clinic licensing applications represented that Ravipati was only present at Premier Bay Plaza once a week.

232.    Bayview West Main's October 2023 clinic licensing application represented that Zaccari was only present at Bayview West Main and Bayview Park once a week, for one hour.

233.    Bayview West Main's April 2024 clinic licensing application represented that Ravipati was only present at Bayview West Main once a month.

234.    Family Health's November 2021 clinic licensing application represented that Ravipati was only present at Family Health eight hours per month.

235.    Family Health's November 2025 clinic licensing application represented that Ravipati was only present at Family Health two hours per week.

236.    In the claims identified in Exhibits "1" – "3", the Defendants falsely

represented that Premier, Bayview, and Family Health were in compliance with the Clinic Act and eligible to receive PIP reimbursement.

237.   In fact, Premier, Bayview, and Family Health were not in compliance with the Clinic Act, and as a result they were not eligible to receive PIP reimbursement.

**III.   The Fraudulent Claims the Defendants Submitted – or Caused to be Submitted – to GEICO**

238.   To support their fraudulent charges, the respective Defendants systematically submitted thousands of HCFA-1500 forms and treatment reports to GEICO through Premier, Bayview, and Family Health – containing thousands of individual charges – seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive.

239.   The claims that the Defendants submitted – or caused to be submitted – to GEICO were false and misleading in the following, material respects:

(i)   The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Defendants were in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, they were not.

(ii)   The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, they were not.

(iii)   The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary, and in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich the Defendants, not to provide medically

necessary treatment to Insureds.

(iv)    The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

240. The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

241. To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

242. For instance, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that the Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

243. The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently were never performed in the first instance.

244. The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services oftentimes were unlawfully performed by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

245. The Defendants have hired law firms to pursue collection of the

fraudulent charges for the Fraudulent Services from GEICO and other insurers if the charges were not promptly paid in full.

246. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to – and did – cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $2,300,000.00.

247. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Premier, Bayview, and Family Health**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

248. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

249. There is an actual case and controversy between GEICO and Premier, Bayview, and Family Health regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

250. Premier, Bayview, and Family Health have no right to receive payment for any pending bills submitted to GEICO because Premier, Bayview, and Family Health were unlawfully operated in violation of Florida law.

251.    Premier, Bayview, and Family Health have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO.

252.    Premier, Bayview, and Family Health have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

253.    Premier, Bayview, and Family Health have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

254.    Premier, Bayview, and Family Health have no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

255.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Premier, Bayview, and Family Health have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Miller**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

256. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

257. Premier is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

258. Miller has knowingly conducted and/or participated in, directly or indirectly, the conduct of Premier's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that Premier was not eligible to receive under the No-Fault Law because: (i) Premier was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

259. A representative sample of the fraudulent bills and corresponding

mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

260.    Premier's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Miller operated Premier, inasmuch as Premier was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Premier to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Premier and Miller continue to attempt collection on the fraudulent billing submitted through Premier to the present day.

261.    Premier is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Premier in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

262.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $864,000.00 pursuant to the fraudulent bills submitted through the Premier enterprise.

263.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and

further relief as this Court deems just, proper, and equitable.

<strong><u>THIRD CAUSE OF ACTION</u></strong><br><strong>Against Miller and Ravipati</strong><br><strong>(Violation of RICO, 18 U.S.C. § 1962(d))</strong>

264. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

265. Premier is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

266. Miller and Ravipati were employed by – or associated with – the Premier enterprise.

267. Miller and Ravipati knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Premier's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that Premier was not eligible to receive under the No-Fault Law because: (i) Premier was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were

never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

268. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

269. Miller and Ravipati knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

270. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $864,000.00 pursuant to the fraudulent bills submitted through the Premier enterprise.

271. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**FOURTH CAUSE OF ACTION**
**Against Premier, Miller, and Ravipati**
**(Under Fla. Stat. §§ 501.201 et seq.)**

272. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

273. Premier, Miller, and Ravipati are actively engaged in trade and commerce in the State of Florida.

274. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

275. Premier, Miller, and Ravipati engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

276. The bills and supporting documents submitted – or caused to be submitted – to GEICO by Premier, Miller, and Ravipati were fraudulent in that they misrepresented: (i) Premier's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

277. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Premier, Miller, and Ravipati has been materially injurious to GEICO and its Insureds.

278. The conduct of Premier, Miller, and Ravipati was the actual and proximate cause of the damages sustained by GEICO.

279. Premier, Miller, and Ravipati's unfair and deceptive acts have caused GEICO to sustain damages of at least $864,000.00.

280. By reason of Premier, Miller, and Ravipati's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. §

501.211(2).

**FIFTH CAUSE OF ACTION**
**Against Premier, Miller, and Ravipati**
**(Common Law Fraud)**

281.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

282.    Premier, Miller, and Ravipati intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through Premier for the Fraudulent Services.

283.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Premier was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

284.    Premier, Miller, and Ravipati intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Premier that were not reimbursable.

120

285.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $864,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by Premier, Miller, and Ravipati through Premier.

286.    Premier, Miller, and Ravipati's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

287.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### SIXTH CAUSE OF ACTION
**Against Premier, Miller, and Ravipati**
**(Unjust Enrichment)**

288.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

289.    As set forth above, Premier, Miller, and Ravipati have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

290.    When GEICO paid the bills and charges submitted – or caused to be submitted – by Premier, Miller, and Ravipati through Premier, it reasonably believed that it was legally obligated to make such payments based on Premier, Miller, and Ravipati's improper, unlawful, and/or unjust acts.

291.    Premier, Miller, and Ravipati have been enriched at GEICO's expense

by GEICO's payments, which constituted a benefit that Premier, Miller, and Ravipati voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

292.  Premier, Miller, and Ravipati's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

293.  By reason of the above, Premier, Miller, and Ravipati have been unjustly enriched in an amount to be determined at trial, but in no event less than $864,000.00.

<u>SEVENTH CAUSE OF ACTION</u>
**Against Salvia, J. Ascensao, N. Ascensao, and Sanchez**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

294.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

295.  Bayview is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

296.  Salvia, J. Ascensao, N. Ascensao, and Sanchez have knowingly conducted and/or participated in, directly or indirectly, the conduct of Bayview's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or caused to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that Bayview was not eligible to receive under the No-Fault Law because: (i) Bayview was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not

medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

297. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

298. Bayview's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Salvia, J. Ascensao, N. Ascensao, and Sanchez operated Bayview, inasmuch as Bayview was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Bayview to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Bayview, Salvia, J. Ascensao, N. Ascensao, and Sanchez continue to attempt collection on the fraudulent billing submitted through Bayview to the present day.

299. Bayview is engaged in inherently unlawful acts, inasmuch as it continues

to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Bayview in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

300. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $804,000.00 pursuant to the fraudulent bills submitted through the Bayview enterprise.

301. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## EIGHTH CAUSE OF ACTION
**Against Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

302. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

303. Bayview is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

304. Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati were employed by – or associated with – the Bayview enterprise.

305. Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Bayview's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §

1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that Bayview was not eligible to receive under the No-Fault Law because: (i) Bayview was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

306.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

307.    Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

308.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $804,000.00 pursuant to the fraudulent bills submitted through the Bayview enterprise.

309.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## NINTH CAUSE OF ACTION
**Against Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati**
**(Under Fla. Stat. §§ 501.201 et seq.)**

310.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

311.    Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari and Ravipati are actively engaged in trade and commerce in the State of Florida.

312.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

313.    Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari and Ravipati engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

314.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari and Ravipati were fraudulent in that they misrepresented: (i) Bayview's

126

eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

315.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari and Ravipati has been materially injurious to GEICO and its Insureds.

316.    The conduct of Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari and Ravipati was the actual and proximate cause of the damages sustained by GEICO.

317.    Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari and Ravipati's unfair and deceptive acts have caused GEICO to sustain damages of at least $804,000.00.

318.    By reason of Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari and Ravipati's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

### TENTH CAUSE OF ACTION
**Against Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati**
**(Common Law Fraud)**

319.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

127

320.    Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through Bayview for the Fraudulent Services.

321.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Bayview was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

322.    Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Bayview that were not reimbursable.

323.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at

least $804,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati through Bayview.

324.    Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

325.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**ELEVENTH CAUSE OF ACTION**
**Against Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati**
**(Unjust Enrichment)**

326.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

327.    As set forth above, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

328.    When GEICO paid the bills and charges submitted – or caused to be submitted – by Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati through Bayview, it reasonably believed that it was legally obligated to make such payments based on Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati's improper, unlawful, and/or unjust acts.

329. Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

330. Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

331. By reason of the above, Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati have been unjustly enriched in an amount to be determined at trial, but in no event less than $804,000.00.

## TWELFTH CAUSE OF ACTION
### Against Pujols
### (Violation of RICO, 18 U.S.C. § 1962(c))

332. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

333. Family Health is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

334. Pujols has knowingly conducted and/or participated in, directly or indirectly, the conduct of Family Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years

seeking payments that Family Health was not eligible to receive under the No-Fault Law because: (i) Family Health was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

335. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

336. Family Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Pujols operated Family Health, inasmuch as Family Health was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Family Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that

131

Family Health and Pujols continue to attempt collection on the fraudulent billing submitted through Family Health to the present day.

337.   Family Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Family Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

338.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $693,000.00 pursuant to the fraudulent bills submitted through the Family Health enterprise.

339.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### THIRTEENTH CAUSE OF ACTION
### Against Pujols and Ravipati
### (Violation of RICO, 18 U.S.C. § 1962(d))

340.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

341.   Family Health is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

342.   Pujols and Ravipati were employed by – or associated with – the Family Health enterprise.

343.   Pujols and Ravipati knowingly have agreed, combined, and conspired to

132

conduct and/or participate in, directly or indirectly, the conduct of Family Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that Family Health was not eligible to receive under the No-Fault Law because: (i) Family Health was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

344. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

345. Pujols and Ravipati knew of, agreed to, and acted in furtherance of the

133

common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

346.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $693,000.00 pursuant to the fraudulent bills submitted through the Family Health enterprise.

347.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### FOURTEENTH CAUSE OF ACTION
**Against Family Health, Pujols, and Ravipati**
**(Under Fla. Stat. §§ 501.201 et seq.)**

348.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

349.    Family Health, Pujols, and Ravipati are actively engaged in trade and commerce in the State of Florida.

350.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

351.    Family Health, Pujols, and Ravipati engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

352.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by Family Health, Pujols, and Ravipati were fraudulent in that

they misrepresented: (i) Family Health's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

353.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Family Health, Pujols, and Ravipati has been materially injurious to GEICO and its Insureds.

354.    The conduct of Family Health, Pujols, and Ravipati was the actual and proximate cause of the damages sustained by GEICO.

355.    Family Health, Pujols, and Ravipati's unfair and deceptive acts have caused GEICO to sustain damages of at least $693,000.00.

356.    By reason of Family Health, Pujols, and Ravipati's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

### FIFTEENTH CAUSE OF ACTION
**Against Family Health, Pujols, and Ravipati**
**(Common Law Fraud)**

357.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

358.    Family Health, Pujols, and Ravipati intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through Family Health for the Fraudulent Services.

135

359.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Family Health was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

360.    Family Health, Pujols, and Ravipati intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Family Health that were not reimbursable.

361.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $693,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by Family Health, Pujols, and Ravipati through Family Health.

362.    Family Health, Pujols, and Ravipati's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

363.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## SIXTEENTH CAUSE OF ACTION
### Against Family Health, Pujols, and Ravipati
### (Unjust Enrichment)

364.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-247, above.

365.   As set forth above, Family Health, Pujols, and Ravipati have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

366.   When GEICO paid the bills and charges submitted – or caused to be submitted – by Family Health, Pujols, and Ravipati through Family Health, it reasonably believed that it was legally obligated to make such payments based on Family Health, Pujols, and Ravipati's improper, unlawful, and/or unjust acts.

367.   Family Health, Pujols, and Ravipati have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Family Health, Pujols, and Ravipati voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

368.   Family Health, Pujols, and Ravipati's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

369.   By reason of the above, Family Health, Pujols, and Ravipati have been unjustly enriched in an amount to be determined at trial, but in no event less than $693,000.00.

## JURY DEMAND

370.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Premier, Bayview, and Family Health, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Premier, Bayview, and Family Health have no right to receive payment for any of the pending bills submitted to GEICO.

B.    On the Second Cause of Action against Miller, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $864,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

C.    On the Third Cause of Action against Miller and Ravipati, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $864,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

D.    On the Fourth Cause of Action against Premier, Miller, and Ravipati, compensatory damages in an amount to be determined at trial but in excess of $864,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

E.    On the Fifth Cause of Action against Premier, Miller, and Ravipati, compensatory damages in an amount to be determined at trial but in excess of $864,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

F.    On the Sixth Cause of Action against Premier, Miller, and Ravipati, more than $864,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

G.    On the Seventh Cause of Action against Salvia, J. Ascensao, N. Ascensao, and Sanchez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $804,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

H.    On the Eighth Cause of Action against Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $804,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

I.    On the Ninth Cause of Action against Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati, compensatory damages in an amount to be determined at trial but in excess of $804,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

J.    On the Tenth Cause of Action against Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati, compensatory damages in an amount to

be determined at trial but in excess of $804,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

K.    On the Eleventh Cause of Action against Bayview, Salvia, J. Ascensao, N. Ascensao, Sanchez, Zaccari, and Ravipati, more than $804,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

L.    On the Twelfth Cause of Action against Pujols, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $693,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

M.    On the Thirteenth Cause of Action against Pujols and Ravipati, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $693,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

N.    On the Fourteenth Cause of Action against Family Health, Pujols, and Ravipati, compensatory damages in an amount to be determined at trial but in excess of $693,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

O.    On the Fifteenth Cause of Action against Family Health, Pujols, and Ravipati, compensatory damages in an amount to be determined at trial but in excess of $693,000.00, together with punitive damages, costs, and interest, along with such

other and further relief as this Court deems just, proper, and equitable.

P. On the Sixteenth Cause of Action against Family Health, Pujols, and Ravipati, more than $693,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Dated: Jacksonville, Florida
  April 17, 2026

*/s/ Max Gershenoff*

Max Gershenoff, Lead Counsel (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen Wenger (FBN 92136)
Katherine Gonzalez (FBN 1072847)
RIVKIN RADLER LLP
1301 Riverplace Blvd., 10th Floor
Jacksonville, Florida 32207
Phone: (904) 792-8925
-and-
926 RXR Plaza
Uniondale, New York 11550
Phone: (516) 357-3000
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Lindsey.Trowell@rivkin.com
Kristen.Wenger@rivkin.com
Katherine.Gonzalez@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO Insurance Company, and GEICO Casualty Co.*